UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

MERENDON MINING (Nevada), INC.                    Case No.: 09-11958-BKC-AJC
a/k/a Milowe Brost,

                                                  Chapter 7

        Debtor.
_____/

MARCIA DUNN, Chapter 7 Trustee

        Plaintiff,
v.                                                Adv. Pro. No.

MILOWE BROST, ELIZABETH BROST,
GARY SORENSON, THELMA SORENSON,
LARRY ADAIR, MARTIN WERNER,
MERENDON MINING (Colorado), INC.,
MERENDON MINING (Arizona), INC.,
MERENDON MINING (California), INC.,
TRUE NORTH PRODUCTIONS, LLC,
CAPITAL ALTERNATIVES, INC., CAPITAL
ALTERNATIVES (ASIA) LTD., THE INSTITUTE
FOR FINANCIAL LEARNING, GROUP OF
COMPANIES, INC., MERENDON MINING
CORPORATION, LTD., MERENDON MINING, INC.,
MERENDON DE HONDURAS S.A. DE C.V.,
MERENDON DE VENEZUELA C.A., MERENDON
DE PERU S.A., MERENDON DE ECUADOR S.A.,
SYNDICATED GOLD DEPOSITORY S.A. n/k/a
BAHAMA RESOURCE ALLIANCE, LTD., CONSUMER
DEBT RECOVERY TRUST/ HERITAGE FINANCIAL,
S.A., C.D.R.T. PROGRAM, STELLER (STELLAR) TRUST,
360 OR 3SIXTY EARTH RESOURCES, LTD.,
STERLING TRUST, BASE METALS CORPORATION,
STRATEGIC METALS CORPORATION,
ARBOR (ARBOUR) ENERGY, INC., EVERGREEN
MANAGEMENT SERVICES, LTD, QUATRO
COMMUNICATION CORPORATION, ALLUVIAL
UNITED INC., BEARSTONE CAPITAL MANAGEMENT
INC., BRIDGEWATER & CO. INC., CASCADIA
MANAGEMENT SERVICES S.A., EXPEDIA
LOGISTICS, FORTRIS BUSINESS SYSTEMS, INC.,
NORDIC MERCHANT CREDIT UNION, ONYX

1

**TRADING GROUP LLC, PERMA SECURITIES S.A.,
STELLER MANAGEMENT SERVICES, TENA
CAPITAL CORPORATION, TRANISICIONES
UNIVERSIAL S.A., WATCHERS INTERNATIONAL
TRANSIT LTD., GOLDENTRAIL EQUITY
MANAGEMENT LIMITED PARTNERSHIP,
GOLDENTRAIL MANAGEMENT CORPORATION,
and i E GROUP, INC.**

      **Defendants.**

_____/

## ADVERSARY COMPLAINT

The Chapter 7 Trustee, Marcia Dunn (the "Trustee"), by and through her undersigned

counsel, hereby files this adversary proceeding (the "Complaint") against Milowe Brost,

Elizabeth Brost, Gary Sorenson, Thelma Sorenson, Larry Adair, Martin Werner, Merendon

Mining (Colorado), Inc., Merendon Mining (Arizona), Inc., Merendon Mining (California), Inc.,

True North Productions, LLC, Capital Alternatives, Inc., Capital Alternatives (Asia), Ltd., The

Institute for Financial Learning, Group of Companies, Inc., Merendon Mining Corporation, Ltd.,

Merendon Mining, Inc., Merendon de Honduras S.A. de C.V., Merendon de Venezuela C.A.,

Merendon de Peru S.A., Merendon de Ecuador S.A., Syndicated Gold Depository S.A. n/k/a

Bahama Resource Alliance, Ltd., Consumer Debt Recovery Trust/ Heritage Financial, S.A.,

C.D.R.T. Program, Steller (Stellar) Trust, 360 Earth Resources, Ltd., Sterling Trust, Base Metals

Corporation, Strategic Metals Corporation, Arbor (Arbour) Energy, Inc., Evergreen Management

Services, LTD, Quatro Communication Corporation, Alluvial United Inc., Bearstone Capital

Management Inc., Bridgewater & Co. Inc., Cascadia Management Services S.A., Expedia

Logistics, Fortris Business Systems, Inc., Nordic Merchant Credit Union, Onyx Trading Group

LLC, Perma Securities S.A., Steller Management Services, Tena Capital Corporation,

Transisiciones Universial S.A., Watchers International Transit Ltd., GoldenTrail Equity

2

Management Limited Partnership, GoldenTrail Management Corporation, and i E Group, Inc., and alleges:

## Procedural History

1.      Merendon Mining (Nevada), Inc. ("Merendon Mining (Nevada)" or the "Debtor") is a Nevada corporation, whose principal place of business was in Miami Beach, Miami-Dade County, Florida, and is the Debtor in the above-styled case.

2.      On February 4, 2009, Eileen McCabe, Jane Otto, and Diane Kaplan-Berk (the "Petitioning Creditors") filed an Involuntary Petition against Merendon Mining (Nevada) requesting an order for relief under chapter 7 of the Bankruptcy Code.  [Docket No. 1].

3.      On June 6, 2009, this Court entered an Order for Relief under chapter 7.  [Docket No. 29].

4.      Marcia Dunn was appointed as the Chapter 7 Trustee on June 10, 2009 [Docket No. 30], and is the acting Chapter 7 Trustee for the benefit of the creditors of the Debtor's estate.

## Jurisdiction and Venue

5.      This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001(1), (7), and (9).

6.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§157(b)(2) and 1334, and 11 U.S.C. §105.

7.      Venue is proper pursuant to 28 U.S.C. §1409 and other applicable law.

## Parties

8.      Milowe or Milo Brost ("Brost") is an individual who resides in Alberta, Canada, and is the President of the Debtor.

9.    Brost is currently under arrest by the Royal Canadian Mounted Police ("RCMP") and awaiting criminal charges in Alberta, Canada, as a result of the fraudulent scheme outlined in this Adversary Complaint.

10.    Elizabeth Brost ("Elizabeth") is Brost's ex-wife, and was the co-founder, officer and director of many of the Alter Ego as defined below herein. Elizabeth is a Canadian national residing in Honduras.

11.    Larry Adair ("Adair") is an individual who resides in Fort Lauderdale, Florida. Adair served as the personal attorney for Gary Sorenson and, upon information and belief, was involved in the creation and formation of the Debtor.

12.    Martin Werner ("Werner") is an individual who served as an attorney for both Brost and Sorenson pertaining to Merendon Mining and IFFL matters.  Werner is the President of Bahama Resource Alliance, Ltd. and GoldenTrail Management Corporation, two of the Alter Ego Defendants listed herein.

13.    Capital Alternatives, Inc. ("Capital Alternatives") is an Alberta corporation incorporated in 1999.

14.    Capital Alternatives (Asia), Inc. ("Capital Alternatives (Asia)") is a corporation, whose place of incorporation is unknown.

15.    The Institute for Financial Learning, Group of Companies, Inc. (the "IFFL") is an Alberta corporation incorporated in 2003, with a principal office in Calgary, Alberta, and the successor to Capital Alternatives.

16.    Merendon Mining Corporation, Ltd. ("Merendon Canada") is an Alberta corporation organized in 1996, with its principal place of business in Calgary, Alberta. Upon information and belief, Merendon Canada is now domiciled in Belize with its headquarters in

Honduras.  Merendon Canada purportedly owns mining concessions, gold bullion, and a refinery as collateral for investments.

17.    Gary Sorenson ("Sorenson") is an individual who, upon information and belief, is the Chief Executive Office ("CEO") of Merendon Canada, and who resides in Alberta, Canada.

18.    Sorenson is currently under arrest by the RCMP and awaiting criminal charges in Alberta, Canada, as a result of the fraudulent scheme outlined in this Adversary Complaint.

19.    Thelma ("Thelma") Sorenson is Sorenson's wife, a director and officer of many of the Alter Ego entities, as defined below herein, and is a Honduran national who resides in Boca Raton, Florida.

20.    Sorenson, and Brost, along with their spouse and ex-spouse, Thelma and Elizabeth, are the primary recipients of the proceeds from the fraudulent scheme outlined in this adversary complaint.

21.    Syndicated Gold Depository, S.A. ("Syndicated Gold") n/k/a Bahama Resource Alliance, Ltd., is a Bahamian corporation which, upon information and belief, operated in Miami, Florida, Panama City, Panama and Nassau, Bahamas.

22.    Strategic Metals, Inc. or Strategic Metals Corporation ("Strategic Metals") was an IFFL related business entity operating in Alberta, Canada. Strategic Metals was purported to be engaging in the business of financing mining operations.

23.    Merendon Mining (Colorado), Inc. ("Merendon Mining (Colorado)") is a Colorado corporation, with its principal place of business in Broomfield, Colorado.

24.    Merendon Mining (Arizona), Inc. ("Merendon Mining (Arizona)") is a Nevada corporation, with its principal place of business in Las Vegas, Nevada.

25.     Merendon Mining (California), Inc. ("Merendon Mining (California)") is a Nevada corporation, with its principal place of business in Las Vegas, Nevada.

26.     True North Productions, LLC ("True North Productions") is a Nevada corporation, with its principal place of business in Las Vegas, Nevada.

27.     Merendon Mining, Inc. ("MMI") is a corporation, whose place of incorporation is unknown.

28.     Merendon de Honduras S.A. de C.V. ("Merendon Honduras"), is a Honduran corporation.

29.     Merendon de Venezuela C.A. ("Merendon Venezuela"), is a Venezuelan corporation.

30.     Merendon de Peru S.A. ("Merendon Peru"), is a Peruvian corporation.

31.     Merendon de Ecuador S.A. ("Merendon Ecuador"), is an Ecuadorian corporation.

32.     Consumer Debt Recovery Trust/ Heritage Financial, S.A. ("Heritage") is a legal entity whose corporate status and place of incorporation is unknown.

33.     C.D.R.T. Program ("C.D.R.T.") is a legal entity whose corporate status and place of incorporation is unknown.

34.     Steller (Stellar) Trust Services, Ltd. ("Steller") is a legal entity whose corporate status and place of incorporation is unknown.

35.     360 Earth Resources, Ltd. or 3sixty Earth Resources, Ltd. ("360") is a Cypriot legal entity.

36.     Sterling Trust ("Sterling") is a legal entity whose corporate status and place of incorporation is unknown.

37.     Base Metals Corporation ("Base") is a Nevis West Indies corporate body.

38.    Arbor (Arbour) Energy, Inc. ("Arbor") is an Alberta corporation.

39.    Evergreen Management Services, LTD ("Evergreen") is a Nevis West Indies corporate body.

40.    Quatro Communication Corporation ("Quatro") is an Alberta corporation.

41.    Alluvial United Inc. ("Alluvial") is a corporation whose place of incorporation is unknown.

42.    Bearstone Capital Management Inc. ("Bearstone") is a British Columbia corporation.

43.    Bridgewater & Co. Inc. ("Bridgewater") is a corporation whose place of incorporation is unknown.

44.    Cascadia Management Services S.A. ("Cascadia") is a foreign company whose corporate status and place of incorporation is unknown.

45.    Expedia Logistics Inc. ("Expedia") is an Alberta corporation.

46.    Fortris Business Systems, Inc. ("Fortris") is a Belize corporation.

47.    Nordic Merchant Credit Union ("Nordic") is a credit union whose place of incorporation is unknown.

48.    Onyx Trading Group LLC ("Onyx") is a limited liability company whose place of incorporation is unknown.

49.    Perma Securities S.A. ("Perma") is a foreign company whose corporate status and place of incorporation is unknown.

50.    Steller Management Services ("SMS") is a legal entity whose corporate status and place of incorporation is unknown.

51.     Tena Capital Corporation or Tena Capital Fund ("Tena") is a corporation whose place of incorporation is unknown.

52.     Transciones Universal S.A. ("TU") is a foreign company whose corporate status and place of incorporation is unknown.

53.     Watchers International Transit Ltd. ("Watchers") is a legal entity whose corporate status and place of incorporation is unknown.

54.     GoldenTrail Equity Management Limited Partnership ("GoldenTrail Equity") is a legal entity whose corporate status and place of incorporation is unknown.

55.     GoldenTrail Management Corporation ("GoldenTrail Management") is a corporation whose place of incorporation is unknown.

56.     i E Group, Inc. ("i E Group") is a corporation whose place of incorporation is unknown.

## BACKGROUND ALLEGATIONS

57.     The factual background for the relief sought in this Adversary Complaint is contained in the affidavits of Paul Garfinkle and Barry Mukumal, attached hereto, and incorporated by reference, as Exhibits A and B to this Adversary Complaint.

### Brost, Sorenson and the IFFL

58.     Beginning on or around 1999, Brost began conducting seminars or financial workshops whereby he would teach the attendees how to maximize their assets by moving them from non-performing to performing assets.

59.     The goal of the presentations were to raise money from the people who participated in the seminar and convert them into investors in Brost's businesses. Brost did this by showing investors that he could provide them with a 37% annual return by leveraging their

passive assets, primarily the equity in their homes, and thereby assure them of their financial freedom. In his presentations, Brost stated that if a participant in his investment scheme borrowed equity from their home, business, IRA or any other non-performing asset and invested it with him, they would see that money earn about a 36% annual return on those funds. If the participant were to let that money grow, the compounding interest reinvested would allow the participant to achieve financial freedom in between 5 and 10 years.

60.    The vehicle through which these opportunities were offered was Capital Alternatives, an Alberta corporation, which later became the IFFL sometime around 2003. The IFFL was formed as a substitute vehicle for servicing Brost's program goals and participant investors.  Participants not only made investments as directed by Brost, but they were also told to set up their own corporate entity from which they would draw salary as a corporate manager. However, these corporations were not managed by the participant because in reality Brost and his company managed the investment of the funds.

61.    Capital Alternatives, and later the IFFL, had investment programs that would allegedly bring annual returns on investment of between 15-36% to its investors. Those programs included gold mining projects in Honduras, Canada, and later the U.S. States, a defaulted credit card debt program, and other similar programs.

62.    Brost was partners with an individual named Gary Allen Sorenson ("Sorenson"). Brost and Sorenson solicited investors for a variety of investment opportunities in which the mining enterprise was just one enterprise. Brost's part in the enterprise was to run Capital Alternatives, which was to be the member network and the sales force. Once the participants were found they became a part of Capital Alternatives, later the IFFL, by investing in several different projects such as Strategic Metals, and other Canadian based investments.

63.    Sorenson had acquired gold mines located in Canada, and developed these mines for investment through a Canadian company, Merendon Mining, Inc. ("MMI"), through a subsidiary or affiliate called Merendon Mining Corporation, Ltd. ("Merendon Canada") both located out of Calgary, Alberta, Canada. Brost and Sorenson were partners in these mining operations in Canada, as well as a refining operation located in Honduras.

64.    The programs offered by Brost morphed and changed over time, but the gold mining operations remained the backup assurance of investment success and security for the participants. Brost represented to his audiences at these seminars that all investment dollars which he and his various companies were receiving from investors were fully secured and backed by gold reserves from mining operations. In 2001 and 2002, the principle gold mining operation was in Honduras.

65.    At times, IFFL members and investors would be invited to Honduras to view the refining operations.

66.    When the IFFL members arrived in Honduras, Brost and Sorenson put on a presentation for the assembled group wherein they explained how Sorenson's mining operation could afford to pay investors more than a 30% return on their money by utilizing private as opposed to bank money, and that all of the investor money was secured by gold bullion stored within the vaults at the Honduras refinery. Sorenson made a point of informing the group about the extent of the money that Brost and his sales groups had made available for the mining operation, and that both he and Brost had become extremely wealthy as a result of all of the investor money that was being funneled into their mining operations.

67.     Sorenson took the groups on a tour of the refinery, which was a part of a huge guarded complex in Tegucigalpa, Honduras that was fully equipped with the latest state of the art equipment.

68.     Sorenson also took groups on a tour of his jewelry operations and explained that some of the gold which he was refining was being used to create and design custom jewelry. The mining operation had a retail jewelry outlet connected with the refinery, and Sorenson would invite participants into the store so they could meet with his staff and, if they wished, buy some of the jewelry from his shop.

69.     Some of the participants bought jewelry from Merendon Mining in Honduras. Upon information and belief, several of the participants had their purchases appraised when they returned to the U.S., and were informed that the jewelry that they purchased was overpriced and not of the quality as represented. Upon completing the various Honduran tours, Sorenson and his wife, Thelma, would invite the group back to have a final dinner at his home.

70.     The IFFL became the vehicle through which Brost and Sorenson introduced the programs to investors, but they used different interrelated sub-entities to actually raise the money.  This included, but was not limited to, the Merendon entities in Central and South America – Merendon de Honduras S.A. de C.V. ("Merendon Honduras"), Merendon de Venezuela C.A. ("Merendon Venezuela"), Merendon de Peru, S.A. ("Merendon Peru"), and Merendon de Ecuador S.A. ("Merendon Ecuador") (collectively, the "South American Merendon Mining Entities"), and the soon-to-be formed Merendon Mining entities in the United States. A more extensive list of these interrelated sub-entities are set forth in the exhibit to the Debtor's Schedule B, Item # 13.

## U.S. Merendon Mining Entities

71.    In 2002, Brost began the process of bringing Merendon Mining to the United States. It was around this time that Paul Garfinkle ("Garfinkle") was introduced to Brost at one of Brost's financial workshops held in Fort Lauderdale, Florida.

72.    At the time he met Brost, Garfinkle held a Power of Attorney over some gold mining properties in Colorado, and had a gold mining opportunity here in the United States. They began to discuss Brost possibly acquiring those assets for some of his programs, through his Merendon Mining investment vehicles. Brost wanted to see some of the reports and paperwork on these opportunities, so Garfinkle sent Brost geologist reports and information concerning the mining opportunity, maps and other supporting documentation.  The name of the mine was The Glory Hole, also known as Chain-O-Mines, located outside of Denver in Central City, Colorado (the "Glory Hole Mine"). The title to the Glory Hole Mine was in litigation between Harold Caldwell ("Caldwell") and Judge Robert Barnes. Garfinkle presented the Glory Hole Mine to Brost as an opportunity for Capital Alternatives, and the related Merendon Mining enterprise, to acquire an interest for the benefit of their investors.

73.    Upon reviewing the information on the Glory Hole Mine, Brost wanted to acquire the mine for the Merendon Mining investments, and said he would fund the litigation as well as the ongoing operations. Brost did not explain how he was going to fund the litigation and operations of the Glory Hole Mine, except that Sorenson and his investment group, through one of their Merendon Mining investment vehicles, would fund the litigation and thereafter develop the mine. Brost and Sorenson funded some of the litigation through an entity called Merendon Group Encumbrance ("Merendon Encumbrance"), but it was later evident that the monies to fund the litigation with regard to the Glory Hole Mine and to subsequently acquire additional

U.S. mines were coming out of investor money.  In particular, the monies used to acquire these mines came from the investors of what eventually turned into the Debtor, Merendon Mining (Nevada), Inc.

74.    Glory Hole was later transferred into the name of Sentinel Mining Corp. ("Sentinel"), a Colorado corporation, for which Brost served as an office and director, and Garfinkle was the registered agent. Ward Capstick ("Capstick"), an individual from Seattle, Washington served as the original registered agent for Sentinel, and was Brost's right hand man. Capstick ran the sales operations for all the Brost and Sorenson companies, including all the Merendon Mining ventures.

75.    In either late 2003 or early 2004, Brost hired Bradley Regier ("Regier") as his treasurer and chief financial officer (CFO) for the Merendon Mining project, and ultimately became the CFO for all of Brost's matters.

76.    The first Merendon Mining company in the United States, Merendon Mining (Nevada), the Debtor, was formed in Nevada on December 30, 2002, to begin to develop the Glory Hole Mine and other mining opportunities. However, there were other existing or ongoing companies which were all part and parcel in the overall Merendon Mining, Brost and Sorenson operation. The purpose of the initial U.S. Merendon Mining company was to take over the Glory Hole Mine and enter into contracts with Caldwell. This first Merendon Mining entity was also to be used to acquire another Colorado property called the Silver Plume Mine (the "Silver Plume Mine"), then owned by Abe Barnhart ("Barnhart").

77.    Sorenson, had his personal lawyer from Fort Lauderdale, Larry Adair ("Adair"), working for and involved with the entity, and was involved in its creation and formation.

78.    Brost and Sorenson hired another Florida attorney named Martin Werner ("Werner") to represent Brost and Sorenson in various legal matters pertaining to both the Merendon Mining and IFFL issues. Werner had previously represented Atlantic and Garfinkle, and they had introduced him to Brost. Werner's brother facilitated the purchase of a condo for them in the ICON building located at 450 Alton Road, Miami Beach, Florida 33131, Suite 2903, which would then serve to become Debtor's corporate headquarters.

79.    Later Werner moved to Panama when he became the legal confidant and representative for Sorenson. Upon information and belief, Werner is the President of a Bahamian company owned and controlled by Sorenson called Syndicated Gold Depository S.A., which is now known as Bahama Resource Alliance, Ltd. ("Syndicated Gold"). Syndicated Gold was developed in response to the changing financial situation within the IFFL and the need for Brost and Sorenson to find new ways to bring in investors, participants, members, and money for their enterprises.

80.    Merendon Mining (Nevada) was the first of several interconnected and intertwined Merendon Mining corporate entities established in the U.S. for the purposes of acquiring interests in American gold mines and operations, and their related offshore manufacturing or smelting facilities.

81.    Merendon Mining (Nevada) was intended to be the holding company for all the U.S. Merendon Mining acquisitions. Brost and Sorensen acted together as sort of co-chief financial and co-chief operating officers, and in such capacity they controlled this and all the other Merendon Mining operations, both in the U.S. and abroad. The two of them were the singular active participants, the directors and the parties in complete control over all of these interconnected and related entities' affairs. All of the properties and companies were under the

direct and strict control and supervision of Brost and Sorenson, who along with members of both their families held their interests through closely held partnerships.

82.     It was also at this time that a fund called the "SOD Fund" was developed and investors were given numbered bank accounts from which they could monitor their investment returns, if they chose that form of investment.  Also at that time, the secondary investments, such as the collection upon credit delinquency were either dropped or were not presented as a part of the IFFL package, with all of the focus being on the Merendon Mining ventures.

83.     As of July, 2, 2003 Brost also created a Mining Interest Development Action Strategy ("MIDAS") program, and opened a MIDAS Fund office in Fort Lauderdale. Brost and other structurists used that office to conduct sales seminars to potential investors within the U.S.

84.     Brost formed Merendon Mining (Colorado) on November 5, 2003 in the State of Colorado. Subsequently, Merendon Mining (Colorado) was to merge into and become part of Debtor. On October 5, 2004, amended and restated Articles of Incorporation were filed with the Nevada Secretary of State changing the name of the Debtor, Merendon Mining (Nevada), Inc. to Merendon Mining (Colorado), Inc., a Nevada corporation. Thus, the Debtor, Merendon Mining (Nevada) n/k/a Merendon Mining (Colorado), a Nevada corporation, and Merendon Mining (Colorado), a Colorado corporation, have identical names, and were intended to be one and the same entity.

85.     Brost maintained bank accounts at US Bank in Colorado, and all of the investor monies were initially deposited into those accounts. The funds to acquire each of the American mines for the Merendon Mining companies (in Colorado, Arizona, California and Nevada) came through US Bank in Boulder, Colorado under the Debtor, Merendon Mining (Nevada) n/k/a Merendon Mining (Colorado), a Nevada corporation. Investor funds were deposited,

commingled and used to pay a variety of expenses for each of the separate mines owned or to be acquired by each of the separate companies. All the Merendon Mining entities were created as part of Brost's scheme to defraud investors, and were to be operated as a single entity under the Debtor as the umbrella corporation, with the goal of acquiring mining properties, putting them into operation, getting the gold concentrate, and then sending the gold to Sorensen in Honduras for processing by Merendon Honduras, the refinery owned by Sorenson, where the smelting and manufacturing of the gold would take place.

86.    The Debtor, under different corporate umbrellas, would be the entity that acquired the various mining operations. There are four American based Merendon Mining companies:  (1) Debtor, Merendon Mining (Nevada) n/k/a Merendon Mining (Colorado), a Nevada corporation, (2) Merendon Mining (Colorado), a Colorado corporation, (3) Merendon Mining (Arizona), a Nevada corporation, and (4) Merendon Mining (California), a Nevada corporation, collectively, the "U.S. Merendon Mining Entities". Each of the companies had interests in, acquired, or had contracts to buy various mining properties within the United States.

87.    All five of the mines listed on the Debtor's Schedule A were purchased with investor money, raised through the IFFL, placed in the Debtor's accounts at US Bank in Colorado, and contracted for by the Debtor, notwithstanding what corporate entity ultimately acquired title to the mines. The legal descriptions for those mines and their names are attached hereto as Exhibit C, and shall collectively be referred to as the "American Mines".

88.    The "Discovery Day" Mine located in California was purchased by the Debtor through its wholly owned subsidiary, known as Merendon Mining (California), a Nevada corporation, formed on July 13, 2005. Merendon Mining (Arizona), another Nevada corporation, was formed on August 31, 2008 to acquire the "Gold Basin" mine in Dolen Springs, Arizona.

The "Bueno" and "Black Rose" mining properties located in Jamestown, Colorado, were purchased in the name of Merendon Mining (Colorado).

89.    While the individuals who physically worked at a particular mine would work solely for that mine and rarely visit or perform work for or at other mines, all of the U.S. Merendon Mining Entities had the same corporate employees, all of whom served the same role and function no matter which entity for which they were performing a particular task. Les Taylor ("Taylor"), an individual who had previously worked with Sorenson in his other operations, came to work as Director of Mining Operations for all the Merendon Mining companies, particularly the U.S. Merendon Mining Entities.

90.    Sorenson and Brost had created Merendon Mining, and the U.S. Merendon Mining Entities were all a part of this large worldwide complex run under the Merendon or Merendon Mining name, whether it was in Canada, the United States, or Central and South America.

91.    Brost and Sorenson would form a separate corporation for each of their entities as needed. There was never a clear delineation from company to company as Brost and Sorenson considered all of the companies as one and the same enterprise to defraud the investors.

92.    There were regular meetings, mine tours, and seminars for investors. At each of these seminars, the investors were told that they would be getting a return on their investment, and that their investments were all backed by gold possessed by Sorenson. However, the investors were never advised as to how or in which Merendon Mining entity the funds were being invested. As far as Brost and Sorenson were concerned, it was all one enterprise whether it was Canada, the United States, or Honduras, and it was all treated, and presented to the investors, as one and the same enterprise.

93.    The investors were not given a choice as to which Merendon Mining entity they wanted their money invested. There was no delineation between the four companies - it was all "Merendon Mining." When an investor went to an IFFL meeting, he or she would be solicited to invest in "Merendon Mining," without any distinction between Merendon Mining (Colorado), Merendon Mining (Nevada), Merendon Mining (Arizona), or Merendon Mining (California). Rather, the investor was sold on the singular Merendon Mining enterprise, operated as an umbrella through the Debtor, encompassing the entire American, Canadian and Honduras companies and their operations, along with other related entities controlled by Brost and Sorenson.

94.    There were no oral or written representations or documentation advising any of the investors that their money was being invested in one Merendon Mining entity over another, or otherwise explaining to the investor that their money was being invested to acquire a specific mine. Funds were raised solely from investors with no investment from the principals. Expenses for the mines were paid without discrimination as to which mine was owned by which company. Whether it was the cost to maintain any particular property, to hire a geologist, or retain an attorney for a closing, the principals dipped into the one source of money maintained in the US Bank accounts comprising the monies raised from the investors, regardless of its source, or which company or mine for whose benefit the expenditure was to be made.

95.    A review of the Debtor and its affiliates' bank statements and other financial documentation reflects the commingling of investor money.

96.    While Brost, Capstick and Regier on their face maintained separate books and records for different companies, the entities were treated as if they were all one enterprise. Within the Merendon Mining scope of companies, there were no separate books and records for

18

the Debtor, Merendon Mining (Colorado), Merendon Mining (Arizona), or Merendon Mining (California).

97.    The Merendon Mining corporate insiders completely and routinely disregarded the corporate formalities.

98.    Notwithstanding that the investor monies were used to finance the acquisition and operations of the five American Mines, only a small amount of the investor money was ever actually used for the U.S. mining acquisitions. The bulk of the money that was raised by investors for IFFL to acquire mining interests in the United States was transferred to Sorensen.

99.    This is supported by the analysis of the US Bank records conducted by Mukamal, which revealed that the primary source of cash inflows into the US Bank accounts were investor funds, transfers from affiliates, and other unidentified deposits.  A significant portion of the cash inflows were by wire transfer; and for each incoming wire the records included the transferee name. The names of the transferees were cross-referenced with a list of investors names to determine which transfers constituted investor funds. While the source of the unidentified deposits could not be ascertained, the vast majority of these were round large dollar amounts (e.g. $200,000.00, $100,000.00), which suggested that they were attributable to investor monies rather than commercial business operations.

100.    The majority of the cash outflows from the US Bank accounts were to affiliates and related parties, although there were outflows for the purchase and upkeep of mining assets, and repayments to investors. In the aggregate, the Debtor transferred $128,924,227.28 to the Debtor's principals, affiliates, and related parties ("Related Party Transfers"). Transfers to these recipients totaled $123,796,740.72, which was more than 75% of the total cash inflows into the US Bank accounts of the Debtor.

101. The largest recipients of the Related Party Transfers were:

    a) True North Productions, a Nevada limited liability company for which Brost is the Managing Member ($53,400,346.00);

    b) Larry Adair/Larry Adair, P.A./Larry Adair Trust, the personal lawyer of Sorenson and involved is most aspects of Merendon Mining (Nevada) ($34,171,894.72);

    c) Martin M. Werner/Martin Werner Attorney Trust account, the attorney who represented Brost and Sorenson in various legal matters pertaining to both Merendon Mining and IFFL issues ($32,247,000.00);

    d) Aurelian Consulting, LLC, a Nevada limited liability company, whose members include Capstick and which has the same address as listed for Brost as a member of True North Productions ($2,336,000.00); and

    e) Merendon Mining (Colorado) and Merendon Mining (California) ($875,000.00).

102. Upon information and belief, the Debtor deposited funds into these accounts for further dissemination to other entities such Syndicated Gold, which monies would then flow from Syndicated Gold into different bank accounts around the world controlled by Sorenson.

103. The Debtor made a payment in the amount of $100,000,000 to Syndicated Gold, which was represented by a promissory note from Syndicated Gold to the Debtor. Upon information and belief, as collateral for the loan, Syndicated Gold provided the Debtor with a profit participation in the South American Merendon Mining Entities - Merendon Honduras, Merendon Ecuador, Merendon Peru, and Merendon Venezuela.

104.    Upon information and belief, the actual amount of money raised in the operations by Brost and Sorenson, and under their management, was between $1.2 to $5 billion from between 3,000 to 4,000 investors in Canada, the United States and others worldwide.

105.    In 2005, Brost, Sorenson and Capstick attempted to overcome legal handicaps presented by an investigation by the Alberta Securities Commission ("ASC") by issuing eight month Promissory Notes to their investors, including almost $150,000,000 from the Debtor itself.  Brost and Sorenson restructured the investors' transactions so that their investment would be evidenced by a short term promissory note issued by the Debtor as the maker of the note, to the investor.  The investor would advance the funds to Debtor, and it was represented by Brost and Sorensen that these notes would be repaid from the revenue generated by these mines owned by the various Merendon Mining companies.

106.    In reality, this was not what happened as no real money was being made from the mining operations. Some investors were paid off out of new money that was raised from new investors. In total, only about $15,000,000 was ever returned to the initial Merendon Mining companies investors. While there was some minimal development work performed on the mines, Brost and Sorenson basically pocketed the money, with most of the funds being siphoned off and funneled to Sorenson, through his refinery, house, and equipment in Honduras.

107.    All told, while the promissory notes affiliated with the Debtor represented between $130,000,000 to $150,000,000, upon information and belief, Brost and Sorenson have raised between $1.2 billion and $5 billion through their various investment vehicles which is unaccounted for among 4,000 investors within the United States (1,000 participants) and Canada (approximately 3,000 participants).

108.    On May 2, 2008, Debtor's Officers and Directors issued a memorandum to the investors indicating Debtor's default on its promissory notes to them, and advised its investors that Debtor, along with its subsidiaries in Colorado, Arizona and California, was changing its name to US-WEST Mining (Nevada) Corporation. In its notice of default, Debtor offered its investors the option to convert their notes to an annuity paid by an insurance company created by Syndicated Gold or to renew their notes, and then proceeded to describe the litany of then pending government administrative and criminal investigations and proceedings brought against Debtor, its affiliates, its principals, and management.

109.    The money raised for the Merendon Mining investment opportunity was used to support the other companies and business opportunities of Sorenson and Brost. The companies for which investor money was raised and went into are those identified on Debtor's Schedule B, Item # 13, and the schedule attached to the same. Of those funds, some went through US Bank, while other funds reached the companies through different bank accounts and platforms around the world.

### Pending Administrative and Criminal Investigations

110.    Both Brost and Sorenson have histories dating back to 1998 with the ASC for a number of violations, including fraud, lying to investors and trading in securities while not being registered with the commission.

111.    ASC investigations into Merendon Canada, Strategic Metals, Arbor and the IFFL have been ongoing for years, with a number of penalties and trading bans being issued over the past decade.

112.    Brost, Sorenson, Regier, and others have not only been sued by the ASC, but are under criminal investigation by both Canadian and United States authorities.

113. The Internal Revenue Service ("IRS"), in conjunction with the Department of Justice ("DOJ"), had been conducting an investigation of the Debtor in connection with the MIDAS program. This investigation then expanded to include the program surrounding the Debtor's issuance of promissory notes to its investors, including IFFL and Syndicated Gold's role in the same, along with the management of each of those entities, and the investigation apparently also includes a grand jury investigation brought by the DOJ in the Eastern District of New York.

114. Two civil suits have also been brought in Houston and Seattle by the DOJ against accounting professionals to bar them from promoting the MIDAS program as an unlawful tax scheme involving bogus gold mining deductions involving the Debtor and the IFFL.

115. The Colorado office of the Securities and Exchange Commission (the "SEC") also has a pending investigation against the Debtor, its subsidiaries, affiliates and management, arising from violations of U.S. securities laws arising from the Debtor's fundraising.

116. On March 21, 2008, the State of Washington Department of Financial Institutions, Securities Division, has also brought actions against the IFFL Strategic Metals, Merendon Canada, Brost, Capstick, Kristina J. Katayama, Ronald R. Case, and Warren L. Bosma, who also comprise the Debtor's officers and directors, and other accounting professionals, with respect to the sale of unregistered securities in that state.

117. In March 2008, the Canadian Revenue Agency launched simultaneous raids on key IFFL figures.

118. As part of a class action lawsuit brought by defrauded investors, on September 22, 2008, a Calgary Court appointed Michael Quilling as Receiver to recover the remaining assets from Strategic Metals. The money held by Strategic Metals has been seized by the receiver

appointed over it in Canada. Strategic Metals and the IFFL records were kept in their offices in Calgary, and were seized by Canadian regulatory authorities in 2005.

119.    On September 15, 2009, Brost was taken into custody and arrested by the Royal Canadian Mounted Police ("RCMP"), at which time an arrest warrant was also issued for Sorenson by the RCMP.

120.    On or about September 30, 2009, Sorenson was also arrested by the RCMP.

## COUNT I:
## DECLARATORY ACTION (ALTER EGO)

121.    The Trustee realleges and reincorporates paragraphs 1 through 120 of this Adversary Complaint as though fully set forth herein.

122.    This is an action against Brost and Sorenson, along with Elizabeth and Thelma, and the various corporate defendants, Capital Alternatives, Capital Alternatives (Asia), IFFL, Merendon Canada, Syndicated Gold, Strategic Metals, Merendon Mining (Colorado), Merendon Mining (Arizona), Merendon Mining (California), True North Productions, MMI, Merendon Honduras, Merendon Venezuela, Merendon Peru, Merendon Ecuador, Heritage, C.D.R.T., Steller , 360, Sterling, Base, Arbor, Evergreen, Quatro, Alluvial, Bearstone, Bridgewater, Cascadia, Expedia, Fortris, Nordic, Onyx, Perma, SMS, Tena, TU, Watchers, GoldenTrail Equity, GoldenTrail Management, and i E Group (collectively, the "Alter Ego Defendants"), for declaratory relief, pursuant to Chapter 86, Florida Statutes, its federal analogue 28 U.S.C. § 2201 (the "Declaratory Relief Act"), and other applicable law.

123.    The Trustee is uncertain of, and requires a determination of whether the assets of the Alter Ego Defendants are subject to administration by the Court as assets of the Debtor.

124.    The Debtor and the Alter Ego Defendants are dominated and controlled by Brost and Sorenson in such a way that they are merely alter egos of each other, and Brost and Sorenson, and are used solely for their personal benefit and to shield assets from their creditors.

125.    The Alter Ego Defendants have common management that is provided directly by Brost and Sorenson.

126.    The Alter Ego Defendants do not observe any corporate formalities with each other on in the execution of documents.

127.    Many or all of the Alter Ego Defendants were inadequately capitalized at formation and at all relevant times thereafter.

128.    Brost and Sorenson founded and had utilized the Alter Ego Defendants for improper purposes including attempting to shield their assets from the claims of the creditors of Debtor.

129.    Brost and Sorenson have utilized the Alter Ego Defendants to siphon off the value of Debtor's assets and reduce the pool of assets available to the Debtor's estate to the detriment of its creditors.

WHEREFORE, the Trustee requests that this Court enter a declaratory judgment finding that (1) the Debtor and Alter Ego Defendants are alter egos of each other, and Brost and Sorenson, (2) these entities and assets including, but not limited to their accounts, the mines, the manufacturing and smelting facilities, including mining rights, equipment and inventory, are part of Debtor's bankruptcy estate under 11 U.S.C. §541, (3) authorizes the Trustee to administer and liquidate these assets for the benefit of the creditors of the Debtor's estate, (4) substantively consolidates these entities into the Debtor's estate, (5) extends the automatic stay under 11 U.S.C. §362 over these entities and these assets, and enjoining all persons or entities from

interfering with the Trustee's administration of these assets, and (6) for such other and further relief as this Court deems necessary and appropriate.

**COUNT II:**
**PIERCING THE CORPORATE VEIL**

130. The Trustee realleges and reincorporates paragraphs 1 through 120 of this Adversary Complaint as though fully set forth herein.

131. This is an action for piercing the corporate veil with respect to the Alter Ego Defendants, brought pursuant to Bankruptcy Code §544(b) and Florida common law.

132. The facts as asserted above suggest that the corporate veil can be pierced with respect to the Alter Ego Defendants by creditors of the Debtor.

133. Brost and Sorenson, as the principals, dominate and control the Alter Ego Defendants to such an extent that they have no independent corporate existences that could be considered distinguishable from that of the Debtor or each other.

134. Corporate existence of the Alter Ego Defendants has been used fraudulently and for an improper purpose of frustrating, hindering, and delaying creditors of the Debtor.

135. The public has been lead to believe that the Debtor and the Alter Ego Defendants are a single entity. The Alter Ego Defendants were incorporated to service Brost and Sorenson's investors and customers while avoiding Debtor's creditors.

WHEREFORE, the Trustee requests that this Court enter an Order piercing the corporate veil of the Alter Ego Defendants by the creditors of the Debtor, adjudicating the Debtor and the Alter Ego Defendants to be one and the same entity, determining that these entities and assets including, but not limited to their accounts, the mines, the manufacturing and smelting facilities, including mining rights, equipment and inventory, are part of Debtor's bankruptcy estate under 11 U.S.C. §541, authorize the Trustee to administer and liquidate these assets for the benefit of

the creditors of the Debtor's estate, substantively consolidates these entities into the Debtor's estate, extend the automatic stay under 11 U.S.C. §362 over these entities and these assets, and enjoining all persons or entities from interfering with the Trustee's administration of these assets, and granting such other and further relief as this Court deems necessary and appropriate.

<u>COUNT III:</u>
<u>DECLARATORY ACTION (PROPERTY OF THE ESTATE AND TURNOVER)</u>

136.    The Trustee realleges and reincorporates paragraphs 1 through 120 of this Adversary Complaint as though fully set forth herein.

137.    This is an action against the Alter Ego Defendants, Brost and Sorenson, for declaratory relief, pursuant to Chapter 86, Florida Statutes, the Declaratory Relief Act, and other applicable law, declaring (i) that certain property in possession of the Alter Ego Defendants is property of the estate pursuant to §541 of the Bankruptcy Code, and (ii) that the Trustee is entitled to turnover of said property pursuant to §542 of the Bankruptcy Code.

138.    The Trustee is uncertain of and requires a determination whether certain assets of the Alter Ego Defendants are property of the estate and subject to administration by the Trustee as assets of the Debtor.

139.    Based on the facts as described herein, the Trustee believes that the following described real and personal property, although not titled in the name of the Debtor, is nonetheless property of the estate by virtue of its possession and/or control by one or more of the Alter Ego Defendants:

a)    Title to Discovery Day Mine, California;

b)    Title to Gold Basin Mine, Dolen Springs, Arizona;

c)    Title to Black Rose Mine, Jamestown, Colorado;

d)    Title to Bueno Mine, Jamestown, Colorado;

27

    e)        Title to Glory Hold Mine, Gilpin County, Colorado;

    f)        Title to the manufacturing (smelting) facility in Honduras and Gold and Jewelry Showroom in Tegucigalpa, Honduras;

    g)       Title to the mineral, gas, and oil rights associated with (a) – (e);

    h)       Title to the equipment and inventory associated with (a) – (f);

    i)        Title to the gold, and finished gold products, associated with (a) – (f);

    j)        U.S. Bank Account #1-036-5825-8183, Broomfield, Colorado;

    k)       U.S. Bank Account #1-536-547-8251, Clackamas, Oregon;

    l)        U.S. Bank Account #2-943-4257-2582, Broomfield, Colorado;

    m)      U.S. Bank Account #1-036-5825-8191, Broomfield, Colorado;

    n)       Stocks and interests in the businesses as listed on Exhibit 1 to Schedule B, item #13, which are also defined as the Alter Ego Defendants; and

    o)       Bank Account of Capital Alternatives (Asia).

140.    To the extent that the above-listed property is determined to be property of the estate, Trustee seeks a determination that she may use, sell or lease under §363 of the Bankruptcy Code.

WHEREFORE, the Trustee requests that this Court enter a declaratory judgment finding:

(i)     The above-listed property is property of the estate pursuant to §541 of the Bankruptcy Code;

(ii)    As property of the estate, the Alter Ego Defendant(s) in possession, custody, or control of said property shall turnover such property, or the value of such property, to the Trustee pursuant to §542 of the Bankruptcy Code;

(iii)   The Trustee may use, sell or lease those assets under §363 of the Bankruptcy Code, and,

(iv)   Granting such any such other and further relief as this Court deems necessary and

appropriate.

## COUNT IV:
## SUBSTANTIVE CONSOLIDATION

141.    The Trustee realleges and reincorporates paragraphs 1 through 120 of this Adversary Complaint as though fully set forth herein.

142.    This is a claim for substantive consolidation of the Alter Ego Defendants into the Debtor's Estate, pursuant to §105(a) of the Bankruptcy Code and other applicable law.

143.    The facts asserted above indicate that substantive consolidation of the Debtor and the Alter Ego Defendants should occur in that:

a)    There is a necessity for substantive consolidation to avoid the injustice, expense, and other harm which would be associated with misallocation of the assets of the Debtor's business with that of the Alter Ego Defendants.

b)    Substantive consolidation would permit the more efficient method of recovery of a wide-range of apparent transfers between the Debtor and the Alter Ego Defendants.

c)    The benefits of substantive consolidation, with respect to equity, economy, and efficiency outweigh any harm which any objecting party may allege.

WHEREFORE, the Trustee respectfully requests that this Court enter a judgment for substantive consolidation of the Debtor and the Alter Ego Defendants, and for such other and further relief as this Court deems necessary and appropriate.

## COUNT V:
## INJUNCTION

144.    The Trustee realleges and reincorporates paragraphs 1 through 120 of this Adversary Complaint as though fully set forth herein.

145.     This is a claim for injunctive relief, pursuant to §726.108(c)(1), Florida Statutes, and to extend the scope of the automatic stay under §362 of the Bankruptcy Code, and other applicable law, in relation to all assets of the Alter Ego Defendants pending determination whether such assets are property of the estate, and against all persons known or unknown attempting to seek dominion and control over these assets to the detriment of the Trustee, the Debtor's Estate and the Debtor's creditors.

146.     In light of the past fraudulent conduct alleged above, it is reasonable to assume that the Alter Ego Defendants have and will continue to misappropriate, divert, or otherwise remove the proceeds of assets that may be property of the estate beyond the Trustee's reach.

147.     Upon information and belief, it is understood that those assets have been and are being currently liquidated by Brost and Sorenson for their benefit and to the detriment of the investor creditors of Debtor.

148.     Additionally, the Trustee has learned that certain entities and persons claiming to represent the interests of various investor/ creditors have been engaging in independent collection activity, both judicially and extra judicially, nationally and internationally, to try and secure these assets for the benefit of certain creditors and not for the benefit of the entire creditor body, and have otherwise been interfering with the Trustee's efforts to secure these assets for the benefit of the Estate.

149.     As a result of the foregoing, it is in the best interests of all parties that Brost, Sorenson, and the Alter Ego Defendants be prevented from taking any action or executing any document consistent with their continued ownership or control of potential property of the estate, that the automatic stay be extended over these assets and that all persons with knowledge of this

action and bankruptcy case be enjoined from proceeding against or exerting ownership or control over these entities and assets to the detriment of the Trustee and the Debtor's Estate.

150.    The estate will be irreparably damaged if the Alter Ego Defendants are entitled to continue acting as if they own and control assets which are property of the estate.

151.    For all the foregoing reasons, the Trustee lacks an adequate remedy at law as a practical matter.  The equitable relief requested herein is required to prevent the likely further dissipation of assets in the event that injunctive relief is not granted.

152.    The Trustee alleges that the likelihood of an ultimate success on the merits of all preceding counts of this Complaint is extremely favorable.

153.    Based upon the best information of the Trustee, no relief requested herein is against any public policy considerations recognized at law or equity.  To the contrary, the relief requested is consistent with all relevant public policy and equitable considerations.

154.    Trustee asks that no bond be set for the issuance of such an injunction.

WHEREFORE, the Trustee demands temporary and permanent injunctive relief prohibiting all of the conduct referenced above, including extending the automatic stay under 11 U.S.C. §362 over these entities and these assets, and enjoining all persons or entities from interfering with the Trustee's administration of these assets, and for such other and further relief as this Court deems necessary and appropriate.

Respectfully submitted,

GRAYROBINSON, P.A.
*Attorneys for Ch. 7 Trustee, Marcia Dunn*
401 E. Las Olas Blvd., Suite 1850
Ft. Lauderdale, Florida 33131
Telephone: (954) 761-8111
Facsimile: (954) 761-8112

By: /s/ Ivan J. Reich
        Ivan J. Reich, Esq.
        Florida Bar No. 778011