## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

In re:                                    )        **CASE NO.:  09-11958-BKC-AJC**
                                          )
**MERENDON MINING (Nevada), INC.** )
**a/k/a Milowe Brost**                    )        **CHAPTER 7**
                                          )
                       **Debtor.**        )

---

### DECLARATION OF PAUL GARFINKLE

STATE OF FLORIDA                 )
                                 ) ss.:
COUNTY OF ~~PALM BEACH~~ BROWARD )

BEFORE ME, the undersigned authority, this day personally appeared PAUL GARFINKLE, the ("Declarant"), who, after being first duly sworn, deposes and says of his own personal knowledge:

1.      I am over the age of eighteen (18), and am competent to provide testimony as to, and have personal knowledge of, all matters set forth herein.

2.      The basis for my own personal knowledge of the facts set forth herein arises from my own personal observations, conversations with the persons referenced throughout herein, in particular Debtor's insiders and affiliates, as identified herein below, and my access to and review of corporate documents of the entities referenced herein. The circumstances and manner in which I was provided access to those documents and individuals is described below herein.

3.      I reside at 5629 American Circle, Delray Beach Florida 33484, which has been my home since 1993.

4.      I have been asked by Marcia Dunn, the Trustee (the "Trustee") in the Merendon Mining (Nevada), Inc.'s ("Debtor") involuntary bankruptcy proceeding (Case

No. 09-11958 Southern District of Florida) to provide to the best of my knowledge and recollection a general overview of the background behind the filing of this involuntary bankruptcy, and Debtor's operations, management, assets and history.

5.      I have been offered no inducement, nor have received any incentive, monetary or otherwise, from either the Trustee or any law enforcement officials, with respect to my cooperation in affording this testimony and declaration. I make this declaration on my own free will and volition.

## PERSONAL BACKGROUND

6.      I graduated from Boston University in 1961 with a Bachelor of Science Degree. I majored in Accounting with a minor in Economics, and thereafter graduated from its law school in 1963 with a Juris Doctor degree.

7.      I was admitted to the Massachusetts Bar in 1963 and maintained a law practice in the Boston area continuously from 1963 through 1981.

8.      In 1969, I became associated with attorney George Osserman, where we eventually formed a partnership under the name Osserman and Garfinkle, and eventually added another partner, Frederick Cains, when the name of the firm was changed to Osserman, Cains and Garfinkle.

9.      Upon moving to Florida on a part time basis in 1975 and on a full time basis in 1977, I was also affiliated with a law firm in downtown Miami, called Osserman, Garfinkle and Greenfield for a period of about three (3) years, and then went into business in accounting here in Florida.

10.    In 1976, my Boston law firm was counsel to a large coal mining tax shelter program located in the Gillette, Wyoming area, which led to an IRS investigation of our firm in 1977.

11.    While I do not admit I engaged in the conduct for which I was charged, I feel nonetheless compelled to let the Court know that on November 18, 1980, my partner Osserman and I plead guilty to conspiracy, mail fraud, and aiding the filing of false tax returns of others and we each were sentenced to serve one year in jail. I of course subsequently lost my license to practice law as a result.

12.    After I returned from jail, I then went into the accounting support businesses as a sole practitioner in the Ft. Lauderdale area where I practiced accounting, bookkeeping services and business consulting services.

13.    On November 17, 1989 my former partner, Osserman and I were indicted for a fraudulent boat tax shelter scheme, and again while I do not admit I engaged in the conduct for which I was charged, I feel nonetheless compelled to let the Court know that I plead guilty on March 13, 1996 together with pleading guilty to a Utah case charging me with money laundering for which I was charged on March 16, 1994.  This conviction was as a result of combining the open Ft. Lauderdale, Florida case with the instant Salt Lake City case in which I was arrested in Salt Lake City, Utah. This combined case was a part of the Salt Lake City, Utah case where I was charged together and received five years probation. I was subsequently charged with violating the terms of the supervised release in that case and was sentenced to two years in prison. My term of imprisonment was completed in 1999, and my probation was completed in 2002. I have had no further involvement with the criminal justice system since that date.

14.     Notwithstanding my prior criminal convictions, the matters I am testifying to herein are true and correct and based upon my own personal knowledge of facts I have witnessed, documents I have reviewed and conversations in which I was present and have partaken.

## ATLANTIC

15.     When not serving my sentences as described above, I was self employed and practiced accounting support services as well as business consulting by myself until March 14, 2001 when Atlantic Avenue D.B. Financial Legal Support Group, Inc. (hereinafter "Atlantic"), was formed, and which was owned by a friend of mine, Lyndha E. Evensen ("Evensen") and her family.

16.     I have acted as a business consultant to Atlantic and others and am not an officer, director or shareholder of Atlantic. The sole officer and director of Atlantic is Evensen. The shareholders of Atlantic are Evensen, members of her family and her family trust.

17.     The nature of Atlantic's business was basically legal and financial support to individuals and companies and helping them develop small business opportunities. Both prior to and since joining Atlantic, I have and continue to perform accounting services for their clients, which basically consists of tax return preparation, preparing books and records, reviewing books and records, giving their clients business advice, and reviewing business proposals. Atlantic has existed as a business services organization offering business advice and support for individuals and small business entities since March of 2001.

18.     My recollection has been recently refreshed by a review of various documents which are present in my files and those of Atlantic and which have been provided to the accountant for the Trustee.

19.     Atlantic and I have assisted both the Merendon Mining entities and members of the Institute for Financial Learning, Inc. (hereinafter "IFFL") in a clerical and advisory capacity since 2002.

20.     IFFL has an address at Suite 314, 1212 31 St. Avenue N.E., Calgary, Alberta T2E 7S8. The telephone number for IFFL was (403) 243-5070.

21.     Our principle duties functioned around member support of the IFFL members. We acted as tax preparers for those United States IFFL members who retained Atlantic and provided some business assistance to them.

## FIRST MEETING WITH BROST

22.     I first met Milowe Allen Brost ("Brost") sometime after September, 2001. I was introduced to Brost by April Pollack-Okin ("Okin"). She invited me to attend a presentation by a financial planner to be held at the Bankers Club in downtown Fort Lauderdale, Florida. Brost was giving a lecture on maximizing returns on capital. At this financial workshop which Brost called his "Institute" I first saw Brost teach the Institute's members on how to maximize their assets by moving them from non-performing to performing assets.

23.     The clear goal of the presentation was to raise money from the people who participated in the seminar and convert them into investors in his businesses. He did not call them "investors" but "participants" and hereafter for purposes of this document I have used the terms "investors" and "participants" interchangeably.   He did this by

showing investors that he could provide them with a 37% annual return by leveraging their passive assets, primarily the equity in their homes, and thereby assure them of their financial freedom. In his presentation Brost stated that if a participant in his investment scheme borrowed equity from their home, business, IRA or any other non-performing asset and invested it with him, they would see that money earn about a 36% annual return on those funds. And if the cost of borrowing was say 10% they would see a net return of 26%. Still if the participant were to let that money grow, the compounding interest reinvested would allow the participant to achieve financial freedom in between 5 and 10 years. This was the essence of the Brost presentations.

24.     Brost also told his audiences that they had a choice of different investment vehicles. The vehicle through which this opportunity was offered was Capital Alternatives, which later became IFFL. His company Capital Alternatives, and later the IFFL, had many investment programs that would bring annual returns on investment of between 15-36% to its investors. Those programs, even before the purchase of the domestic U. S. mining property, included gold mining projects in Honduras and Canada, a defaulted credit card debt program and other similar programs. One such later vehicle was convincing investors to rollover their 401K investments into the IFFL portfolio.

25.     These programs morphed and changed as the time rolled by, but the gold mining operations always remained as the backup assurance of investment success and security for the participant. Brost would continuously represent to his audiences that all investment dollars which he and his various companies were receiving from investors were fully secured and either backed by gold reserves which were held in the Brost and

6

Sorenson vaults at the Merendon Mining refinery in Honduras or other securitized investments.

26.    At the time of my initial meeting with Brost the "Institute" was called Capital Alternatives, Inc. ("Capital Alternatives"), but would later also become known as IFFL. The Brost investment enterprise began as Capital Alternatives, and then later the IFFL was formed as a substitute vehicle for servicing Brost's program goals and participant investors. Brost and Sorenson created multiple corporations that they have used in the pursuit of their purposes and schemes. This information was relayed to me by Brost and Larry Adair ("Adair") and documents provided to me by Brost supporting the same.

27.    Each participant not only made investments as directed by Brost, but they were also told to set up their own corporate entity from which they would draw salary as a corporate manager. Brost and Sorenson caused multiple Canadian corporations to be formed for each investor and had each of the investors as manager of their own corporation. There are literally hundreds of these companies. However, these corporations were not managed by the participant because in reality Brost and his company managed the investment of the funds. Later, this structure would change, especially when Canadian legal authorities started investigating Brost. This information was conveyed to me by Brost, investors, and my review of company and individual tax filings and documents.

28.    The initial presentation I attended was to a small group of no more then four people, and while I didn't initially seek Brost out, following the presentation he and I began to talk about what each of was doing in our respective business ventures and how

7

we could work together and create synergies in our efforts. At the time of the first

seminar, I did not make an investment with Brost, but from that meeting I would continue

to have further detailed contact with Brost, and develop a relationship with him whereby

I became privy to some of the inner workings of his various interconnecting enterprises

and investment vehicles, along with the details of their operations, assets and relevant

participants.

### THE MERENDON MINING ENTITIES

29.    After that first seminar presentation, I invited Brost and some of his

traveling party to meet with me at my home office in Delray Beach, Florida. He brought

two or three of his business associates with him. This was my first sit down meeting with

Brost. At that meeting, Brost, and his associates, described for me in detail the nature of

the investments that Capital Alternatives was making on behalf of the investor body.

There were different business opportunities; some in mining, some in defaulted credit

card debt recovery programs, and a couple of others that I don't remember off hand. At

that particular time he and Capital Alternatives were involved in mining investments. We

got involved in a discussion about mining properties. He told me that he was working

with a gentleman named Gary Allen Sorenson ("Sorenson"). He told me that that they (he

and Sorenson) were mining for gold in gold mines located in Calgary, Alberta, Canada,

and that they were developing these gold mines for investment through a Canadian

company, called Merendon Mining, Inc. (the "Original Merendon"), through a subsidiary

or affiliate called Merendon Mining, Canada, Inc. ("Merendon Canada") both also

located out of Calgary, Alberta, Canada.

30.     I told Brost about some gold mining property that I was involved in through one of my clients. At the time I was holding a Power of Attorney for a long time client of mine over some gold mining properties in Colorado, and I let Brost know that I had a gold mining opportunity here in the United States along with a silver mining opportunity in Colorado. He had some interest and we began to discuss Brost possibly acquiring those assets for some of his programs, through his Merendon Mining investment vehicles. He wanted to see some of the reports and paperwork on these opportunities and after this initial discussion I arranged to have those documents delivered to him. I sent to him geologist reports and information concerning the mining opportunity, maps and other supporting documentation. The name of the mine was The Glory Hole, also known as Chain-O-Mines, located outside of Denver in Central City, Colorado (the "Glory Hole Mine"). The title to the Glory Hole Mine was in litigation between Harold Caldwell ("Caldwell") and Judge Robert Barnes, and I presented the Glory Hole Mine to Brost as an opportunity for Capital Alternatives, and the related Merendon Mining ventures, to acquire an interest for the benefit of their investors.

31.     Not only did Brost express an interest in becoming involved with that property, at that meeting he also asked me to consider joining the Brost team in various capacities. Thereafter I was in frequent communication with Brost and members of Brost's corporate team. I was requested more and more frequently to assist Brost in clerical, business and other duties as required by Brost, which usually consisted of assistance in due diligence with respect to mining acquisitions, contract drafting and negotiations with sellers.

32.    After I sent him the information, he responded that he wanted to go ahead with acquiring the Glory Hole Mine for the Merendon Mining investments and he said he would fund the litigation as well as the ongoing operations. These conversations continued through 2002 into early 2003. He did not tell me how he was going to fund the litigation and operations of the Glory Hole Mine, just that Sorenson and his investment group, through one of their Merendon Mining investment vehicles, would fund the litigation and thereafter develop the mine. At the time, I had no knowledge if the funds were coming from investors or not, though I later came to learn that was the case. They eventually did however fund some of the litigation through an entity called Merendon Group Encumbrance ("Merendon Encumbrance").

33.    What I did come to learn from Brost later was that the monies to fund the litigation with regard to the Glory Hole Mine and to acquire the other mines were coming out of investor money. In particular the monies used to acquire these mines where the monies that came from the investors of what eventually turned into Debtor, Merendon Mining (Nevada), Inc. The investor money he raised was through Capital Alternatives, which became IFFL, and which was the vehicle they used to introduce the programs to investors, but they actually used different interrelated sub-entities to actually raise the money. However, Glory Hole was later transferred into the name of Sentinel Mining Corp. ("Sentinel"), a newly formed Colorado corporation of which Brost was the officer and director, in which I later became its Registered Agent. I became aware of all this through my direct involvement in the Glory Hole purchase, Sentinel, conversations with Brost, and review of Debtor's documents.

34.     Ward Capstick ("Capstick") from Seattle, Washington was the original registered agent for Sentinel until I replaced Capstick as the Registered Agent. Capstick served as Brost's right hand man, and ran the sales operations for all the Brost and Sorenson companies, including all the Merendon Mining ventures. My source of knowledge for this information came from Brost, Sorenson and Capstick and my review of the relevant corporate documents supporting the same.

35.     In either late 2003 or early 2004, Brost hired Bradley Regier ("Regier") as his treasurer and chief financial officer for the Merendon Mining project and ultimately Regier became his CFO for all matters.

36.     Through my conversations with Brost, Sorenson, Capstick, Regier and others working with and for them in these investment vehicles and opportunities, I came to learn and become intimately familiar with the companies formed in the United States, and other countries, including Canada, Honduras, Ecuador and Peru, under different derivations of the name "Merendon Mining" by Brost, Sorenson and others. Those Merendon Mining entities are those entities with the Merendon name set forth in the exhibit to Debtor's Schedule B, Item # 13.

37.     I have provided to the Trustee, and her financial advisors, documents in my possession that I received from Debtor, that support that every one of these Merendon Mining corporations, and the other companies identified on Exhibit 1 to Schedule B, Item # 13 of Debtor's schedules, were an alter ego of Debtor.

## MY VISIT TO CANADA

38.     In 2003, Evensen and I were invited to meet with Brost in Calgary, Alberta, Canada so that we might see the Merendon Mining and other Brost operations

and meet members of his staff. However, only I went to Calgary, where I met Brost and his wife, Elizabeth. At that time, I learned that Elizabeth was a partner with Milo in the business operations and was the secretary of some of his various companies. However, some time in or around 2005 the Brosts got divorced and their assets were divided so that Elizabeth would receive their family compounds in both Honduras and in Calgary.

39.    A short while after the visit to Canada, Brost introduced me to Sorenson, who was also from Calgary, Alberta, Canada. Brost informed me that Brost and Sorenson were 50/50 partners in a Canadian mining operation, which was identified above as the Original Merendon. They supposedly had a mining operation in Canada, and a refining operation in Honduras. Later on, sometime in 2004, I was invited to view the Honduras operation with some of the IFFL members.

## MY VISIT TO HONDURAS

40.    When the IFFL members and I arrived in Honduras for that visit, Brost and Sorenson put on a presentation for the assembled group. In their presentation they explained how Sorenson's mining operation could afford to pay investors a more than 30% return on their money by utilizing private as opposed to bank money and that all of the investor money was secured by gold bullion that was stored within the vaults at the Honduras refinery. Sorenson made a point of informing the assembled people about the extent of money that Milo and his sales groups had made available for the mining operation and that they both had become extremely wealthy as a result of all of the investor money that was being funneled into the Sorenson/Brost mining operations.

41.    Sorenson thereafter took the assembled parties on a tour of the refinery. He showed the assemblage a rolling cart with gold in various forms on the shelves of the

cart. Sorenson then told the assemblage that the value of the gold on the cart was over $1 million. This refinery was a part of a huge guarded complex in Tegucigalpa, Honduras. The whole facility was remarkably clean and fully equipped with the latest state of the art equipment. It must have had a cost of millions of dollars to set up that operation.

42.    Sorenson then took the assemblage on a tour of his jewelry operations and explained that some of the gold which he was refining was being used to create and design custom jewelry. Sorenson said that the mining operation had a retail jewelry outlet connected with the refinery and invited all of the participants to view the jewelry on display in the store. He took the participants into the store so they could meet with his staff and, if they wished, they could buy some of the jewelry from his shop.

43.    Some of the participants did in fact buy some of the jewelry from Merendon Mining there in Honduras. Upon taking these purchases back to the United States several of the participants had their purchases assayed out of curiosity. I was told by some that the jewelry that they had purchased was overpriced and not of the quality as represented. Upon completing the various Honduran tours, Sorenson and his wife Thelma invited the assemblage back to have a final dinner at his home.

44.    Sorenson's home in Honduras is a very large complex with several buildings on the property and sits on the top of a mountain overlooking the city of Tegucigalpa. It is surrounded by a huge fence with about 48 armed guards, has a four story waterfall, a separate movie theatre, a separate dining room building with a large wood table that seats 48 around the table, many artifacts, statuary, etc. It is my estimate that the property is worth $40 million. Sorenson told me that he owned the property without any mortgage.

45.    Throughout the entire trip there was constant conversation between Sorenson, Brost and these investors, a lot of which I overheard. Sorenson and Brost would each tell the assembled participants that Sorenson owned 90% of the business and that Brost had 10% of the participation. This was in conflict with the prior statements that they made to me that they were 50/50 partners in all of the operations. However we all repeatedly heard and were told by them that Sorenson and Brost were together in the deal.

46.    I was also told by Brost and Sorenson that sometime in 2002 Brost had loaned Sorenson $4 million for the development of plant and equipment on the Honduras property.

## MERENDON MINING IN THE UNITED STATES

47.    The first Merendon Mining company in the United States was formed around 2002, in Colorado, with the name Merendon Mining (Colorado), Inc. ("Merendon Colorado") to begin to develop the Glory Hole Mine and other Colorado mining opportunities. However, there were other previous companies or ongoing companies that were all part and parcel in the overall Merendon Mining, Brost and Sorenson operation. The purpose of the initial American Merendon Mining company was to take over the Glory Hole Mine and enter into contracts with Caldwell. This first Merendon Colorado entity was also to be used to acquire another Colorado property called the Silver Plume Mine (the "Silver Plume Mine") then owned by Abe Barnhart ("Barnhart"). Again the source of my knowledge regarding these matters is from my active involvement with these mining ventures, review of the relevant documents associated with the mines and

companies, and my conversations with Brost, Sorenson, Capstick, Regier, Camp and other insiders and affiliates of Debtor, and related and subsidiary companies.

48.    Due to my role in helping develop the Glory Hole Mine, I was provided copies of the various corporate paperwork and documentation, and was quite familiar with Merendon Colorado, and its successor entities. Not only had I reviewed the documentation of these corporate entities I also assisted in the preparation of their tax returns as well. At no time, however was I an officer or director of this company. However, to my best recollection, at its inception, the officers and directors of Merendon Colorado were just Brost and his wife, Elizabeth.

49.    Sorenson, had his personal lawyer from Fort Lauderdale, Adair, working for and involved with the entity, and was involved in its creation and formation. He had been involved in setting up some trusts for Sorenson. I am not sure if he did Merendon Colorado's actual corporate formation or was an officer or a director, but Adair was actively involved in most aspects of Merendon Colorado.

50.    Brost and Sorenson also hired another Florida attorney Martin Werner ("Werner") who lived at 8911 Collins Avenue, Unit 1204, Surfside, Florida 33154 to represent Brost and Sorenson in various legal matters pertaining to both the Merendon Mining and IFFL issues. Werner had previously represented Atlantic and me as our lawyer, and we had introduced him to Brost. Werner's brother facilitated the purchase of a condo for them in the ICON building located at 450 Alton Road, Miami Beach, Florida 33131, Suite 2903, which would then serve to become Debtor's corporate headquarters. After that purchase Werner and his brother also moved into the ICON building.

51.    Later Werner moved to Panama when he became the legal confidant and representative for Sorenson. I have reviewed correspondence showing that Werner was the President of a Bahamian company owned and controlled by Sorenson called Syndicated Gold Depository S.A., which is now known as Bahama Resource Alliance, Ltd. ("SGD"), SGD was developed in response to the changing financial situation within the IFFL and the need for Brost and Sorenson to find new ways to bring in investors, participants, members, and money for their enterprises. The source of this information came from Werner, Brost, Sorenson and other insiders and affiliates of these entities.

52.    Brost told me that he had formed Merendon Colorado, but that it was the first of several interconnected and intertwined Merendon Mining corporate entities established for the purposes of acquiring the American gold mines and operations, and their related offshore manufacturing or smelting facilities. He had told me he was going to have this company, Merendon Colorado, and other similar type companies formed for the purposes of acquiring interests in these mines, and he subsequently did do so.

53.    Brost and I discussed the formation of what is now Debtor, Merendon Mining (Nevada), Inc. a Nevada corporation. I am quite familiar with the intricacies of its formation, operation, assets, structure, investors, management and functions through my extensive conversations with Brost and other corporate insiders of Debtor including Sorenson, Capstick, and Regier. I have also reviewed Debtor's corporate paperwork, and tax ID number application form and other similar documentation.

54.    While I did not prepare Debtor's tax returns, those were done by an accountant William Camp ("Camp"), I did review them and oversaw their preparations, and am quite familiar with those documents. Brost hired Camp, whose address is

Universal Business Systems, Inc., 344 8th Street N.E., Washington, D.C. 20002 as the Certified Public Accounting firm for the Merendon Mining entities. Camp prepared the corporate tax returns for the various Merendon Mining companies for the years 2005 and 2006. Atlantic and I became more and more involved in the preparation of member tax returns because Camp needed additional support.

55.     Debtor was set up to be the holding company for all the American Merendon Mining acquisitions. Brost and Sorensen acted together as sort of co-chief financial and co-chief operating officers, and in such capacity they controlled this and all the other Merendon Mining operations, both in the United States and abroad. The two of them were the singular active participants, the directors and the parties in complete control over all of these interconnected and related entities' affairs. These facts were provided to me through conversions I had directly with Brost, Sorensen, and Camp. I personally attended about four meetings of Debtor during which the information set forth in this affidavit regarding Debtor was conveyed to me by all three of them. In fact, Brost and Sorenson each told me on repeated occasions that all of the properties and companies were under the direct and strict control and supervision of the two of them, who along with members of both their families held their interests through closely held partnerships. While I assumed that Brost was paid by Debtor, I do not specifically recall whether he received a salary.

56.     Merendon Colorado was to merge into and become part of Debtor, which did in fact subsequently occur. The manner of how this occurred was that Debtor Merendon Mining (Nevada), Inc., a Nevada Corporation, subsequently changed its name to Merendon Mining (Colorado), Inc., a Nevada corporation. This was done through the

Nevada Secretary of State. (See attached Notice of Default of Promissory Notes and the Secretary of State filings indicating the same). Debtor and Merendon Colorado now have the identical name; they just have different states of incorporation, but were intended to be one and the same entity.

57.     Brost told me that all the bank accounts were maintained at US Bank in Colorado, and that all of the investor monies were initially deposited into those accounts. They also told me the money to buy these various mining properties came from investors, which I was able to independently verify because many of the investors subsequently became accounting and tax clients of our firm, Atlantic, and I was able to personally confirm this fact through my review of copies of the investors' wire transfers, contracts and other documents with the Merendon Mining entities, and Debtor in particular.

58.     The funds to acquire each of the American mines for the Merendon Mining companies (in Colorado, Arizona, California and Nevada) came through US Bank in Boulder, Colorado under Debtor, Merendon Mining (Colorado), a Nevada corporation, into which accounts investor funds were deposited, commingled and used to pay a variety of expenses for each of the separate mines owned or to be acquired by each of the separate companies. Brost told me that while originally the US Bank accounts were opened in the name of Merendon Colorado, a Colorado corporation; Merendon Colorado was supposed to, and did become part and parcel of Merendon Colorado, the Nevada corporation, who is the Debtor herein, and that Merendon Colorado, and all the other Merendon Mining entities were all to be operated as a single entity under Debtor as the umbrella corporation, whose goal was to acquire mining properties and then put them into operation, get the gold concentrate, and then send the gold to Sorensen in Honduras

for processing by Merendon de Honduras S.A. de C.V. ("Merendon Honduras"), the refinery owned by Sorenson, where the smelting and manufacturing of the gold would take place. All of this information came to me from my conversations with Brost and a review of the accounting records maintained by Camp.

59.    Debtor, under different corporate umbrellas, would be the entity to acquire these various mining operations. There are four American based Merendon Mining companies:  (1) Debtor, Merendon Mining (Nevada), Inc., a Nevada corporation, which later changing its name to Merendon Mining (Colorado), a Nevada corporation, (2) Merendon Mining (Colorado), Inc., a Colorado corporation, (3) Merendon Mining (Arizona), Inc., a Nevada corporation and (4) Merendon Mining (California), Inc., a Nevada corporation.  Each of the companies had interests in or acquired or had contracts to buy various mining properties within the United States.

60.    All five of the mines listed on Debtor's Schedule A were purchased with investor money, raised through Debtor, placed in Debtor's accounts at US Bank in Colorado, contracted for by Debtor, notwithstanding what name the title to the mines was eventually taken.

61.    For example, "Discovery Day" was purchased by Debtor through its wholly owned subsidiary, known as Merendon Mining (California), along with Merendon Mining of Arizona, which was formed to acquire the mine in Dolen Springs, Arizona that is called "Gold Basin", and the Bueno and Black Rose Mining properties are located in Jamestown, Colorado, and taken in the name of Merendon Colorado. Debtor paid about $3 million to Pat Fagen towards the purchase of the Discovery Day mine in Discovery Day, California.

62.    All of the Merendon Mining entities had the same employees, and all employees served the same role and function no matter which entity for which he was performing a particular task. Les Taylor ("Taylor") had previously worked with Sorenson in his other operations and came to work for him as Director of Mining Operations for all the Merendon Mining companies, particularly the American companies. In that regard, Taylor worked for all the companies. However those people who physically worked at a particular mine, would work just for that mine, and would rarely visit or perform work for or at other mines. They all would however report back to Taylor. Taylor lives at 274 Castle Creek Road, Grant's Pass, Oregon, 97526.

63.    Throughout the entire period of my association with Brost, Sorenson and their enterprises, it was always stated or made known that Sorenson and Brost had created Merendon Mining, and that the U.S. Merendon companies were all a part of this large worldwide complex run under the Merendon or Merendon Mining name, whether it was in Canada, the United States, or Central and South America.

64.    I have been told by both Brost and Sorenson on several occasions that they formed a separate corporation for each of their entities as they needed them. There was never a clear delineation from company to company as they considered all of the companies as one and the same. They also apparently never cared what the investors wanted to invest in as it was one massive paper shuffle.

65.    Subsequent to my first investor meeting with Brost in Fort Lauderdale in 2002, I attended other meetings where presentations were made to investors. The presentations were commenced by Brost, and Capstick would speak. Sorensen would speak at some of the presentation meetings. These would be regular meetings, mine tours,

20

and seminars. At each of these presentations, the investors would be told that they were going to get their returns, and that their investments were all backed by gold that Sorenson supposedly had. No differentiation was made between each of the companies. As far as they were concerned this was one enterprise. Whether it was Canada, the United States, or Honduras, it was all treated, and presented to the investors, as one and the same venture.

66.    The investors were not given a choice as to which Merendon Mining entity they wanted their money invested. There was no delineation between the four companies; it was all Merendon Mining. When an investor would go to an IFFL meeting, he or she would be solicited to invest in Merendon Mining, without any distinction between Merendon Mining Colorado, Nevada, Arizona or California. Rather the investor was sold on the singular Merendon Mining enterprise, operated as an umbrella through Debtor, encompassing the entire American, Canadian and Honduras companies and their operations, along with other related entities in the Merendon Mining portfolio of companies.

67.    I am not aware of any oral or written representations or documentation that advised any of the investors that their money was being invested in one Merendon Mining entity over another, or otherwise explained to the investor that their money was being invested to acquire a specific mine. In my review of investors' and Debtor's documents, in my conversations with investors I have done work for through Atlantic, or otherwise have spoken with, or in any of my conversations with Brost, Sorenson, Regier, Capstick or Camp, have I seen or heard evidence indicating which mine or property or company the funds were specifically going to be invested. Funds were raised solely from

investors with no investment from the principals. Expenses for the mines were paid without discrimination as to which mine was owned by which company. Whether it was the cost to maintain any particular property, to hire a geologist or retain an attorney for a closing, the principals dipped into the one source and pot of money maintained at the US Bank accounts comprising the monies raised from the investors, regardless of its source, or which company or mine for whose benefit the expenditure was to be made.

68.     For example, I was commissioned to assist in the closing of the Dolan Springs property called "Gold Basin". When I needed to have money transferred to the title company as part of the closing, I would call Brost who would have me speak with Regier, to whom I would give the account information as to where it was to go and then Regier would send the wire transfer to the title company from the US Bank accounts.

69.     I have reviewed Debtor and its affiliates' bank statements and other financial documentation which reflects that the investor money was commingled. This fact was additionally orally confirmed for me by Brost and Regier, who is the chief financial officer for all of the Brost/ Sorenson operations. Company checks were either signed by Brost or Capstick.

70.     The administration arm for Brost and Sorenson's operations in Calgary was run by Steve Kendall ("Kendall"), whose address was 903 B 48th Avenue, S.E., Calgary, Alberta, CA T20 2A7. However, this management has changed several times since about 2005 when Brost began looking for other means of securing investment money for the gold mining operation.

71.     While Brost, Capstick and Regier on their face maintained separate books and records for different companies, the entities were treated as if they were all one

22

enterprise. Kendall had originally maintained the books and records of the companies, but by the end, Regier was the person mainly fulfilling that role. However, within the Merendon Mining scope of companies they were treated all as one set of books. There were no separate books and records for Debtor, Merendon Colorado, Merendon Arizona or Merendon California; they were all the same. This was confirmed through my review of each of the Merendon Mining entities' corporate books and records, including those of Debtor, as these documents were provided to me by Brost, Regier, Capstick, Sorenson and Camp, in connection with my assisting in the preparation of the Merendon Mining entities' corporate tax returns, as well as those of my investor clients.

72.    While I am not sure if a consolidated return was filed, there was an IRS Form 1120 filed.  I do remember that there was a lot of discussion within the accounting firm as to how to treat all the different entities from a tax and accounting standpoint, but I don't remember how that issue was finally resolved. Yet, from my own personal observation and knowledge, the Merendon Mining corporate insiders completely and routinely disregarded the corporate formalities.

73.    Notwithstanding that the investor monies were used to finance the acquisition and operations of the five American gold mines, ever since my involvement with the Merendon Mining entities since 2002 the bulk of the investor money went to Sorensen through one of his various companies. Only a small amount of the investor money was ever actually used for the US mining acquisitions. The bulk of the money that was raised by investors to IFFL to acquire mining interests in the United States was transferred to Sorensen.

74.     Of the approximately $130,000,000 that was reportedly raised from investors, no more then $30,000,000 went to fund US operations and acquisitions, while about $100,000,000 went to SGD, which $100,000,000 payment was represented by a promissory note from SGD to Debtor. I was told that Debtor's interest in the SGD note was backed by SGD proving Debtor with a profit participation in the South American Merendon Mining These facts were confirmed from a review of the entities corporate tax returns, plus were also verbally confirmed to me by Brost, Sorenson and Capstick on several occasions.

75.     Upon information and belief, conversations with Brost, Capstick, Sorenson and other insiders, investors, clients, structurists and investigators with the Alberta Securities Commission, I became aware that the actual amount of money raised and under management by the Brost/Sorenson operations was between $1.2 to $5 billion raised from between 3,000 to 4,000 investors in Canada, the United States and others worldwide.

76.     In 2005, Brost, Sorenson and Capstick attempted to overcome the legal handicaps presented by an investigation by the Alberta Securities Commission ("ASC") and so as to avoid American law by issuing eight months Promissory Notes to their investors. These notes were issued by Debtor or the Original Merendon. Debtor itself issued almost $150,000,000 in such notes. They restructured the investors' transactions so that their investment would be evidenced by a short term, usually eight months, promissory note issued by Debtor as the maker of the note, to the investor. The investor would advance the funds to Debtor, and it was represented by Brost and Sorensen that

these notes would be repaid from the revenue generated by these mines owned by the various Merendon Mining companies.

77.    However, what actually happened was something else. No real money was being made from mining. Some investors were paid off out of new money that was raised from new investors. All told, it is my understanding that only $15 million was ever returned to some of the initial Merendon Mining companies investors. While there was some minimal development work performed on the mines, Debtor's principals, Brost and Sorenson basically just pocketed the money, with most of the funds being siphoned off and funneled to Sorensen, through his refinery, house, and equipment in Honduras. I have personal knowledge of these facts from conversations with these individuals, review of accounting records in preparation of the companies tax returns, personal observations, and my physically seeing Sorenson's refinery and home in Honduras.

78.    Capstick told me that the money invested by investors went into Debtor's US Bank accounts in Colorado, either directly or through an entity called True North Productions, LLC ("True North"), and would be sent to SGD, which monies then would flow from SGD into different bank accounts around the world controlled by Sorenson. While I have not seen the checks I have reviewed bank statements confirming the money flowing first to True North.  The $100,000,000 that SGD took out of Debtor was evidenced by a promissory note from SGD to Debtor.

79.    The equity ownership, through capital stock, of the various Merendon Mining companies, was supposed to be held 50% by Brost and his family and 50% by Sorenson and his family, though the percentages ultimately became 90% in favor of Sorenson and 10% in favor of Brost.

80.    I was never a shareholder or officer or director of any of these Merendon Mining companies. Atlantic was supposed to hold an equity interest in these companies, but never was, and instead was provided with an investment account similar to those created for most investors and which was supposedly earning about 30% interest per year.

81.    It was not until about 2006, that I first became aware that the money that was being invested by the various investors was being used for purposes other than as represented to them verbally and in the offering memorandums, promissory notes, and the other literature and during the presentations. Word was getting out on the internet about Brost and Sorenson's similar earlier ventures and that Canadian authorities were beginning to investigate their activities in Canada. The buzz from investors and the internet was that this was a scam and rip off and I wanted to get to the bottom of it.

82.    When I first found out that the funds were not being used for the purposes it was intended, I confronted Brost and Sorenson about it, and they denied it, but I have been able to confirm that this occurred from a review of documents, and conversations with Brost, Regier, Martin Werner and Capstick.

### THE OVERALL SCHEME AND ITS OPERATION

83.    The source of my personal knowledge, for this next section from ¶¶83-95 herein and below, derives from conversations I have had with Brost, Werner, Sorenson, investors, ASC investigators, Strategic Metal's Receiver, and Brost's Canadian accountants, as well as my review of American and Canadian tax filings, and my own personal observations.

84.     Brost and Sorenson solicited investors for a basket of investment opportunities in which the Merendon Mining enterprise was just one of these ventures. All told, while the promissory notes affiliated with Debtor only represented between $130,000,000 to $150,000,000, I have been told that Brost and Sorenson through their various investment vehicles raised between $1.2 billion and $5 billion, which is unaccounted for among 4,000 investors within the United States (1,000 participants) and Canada (approximately 3,000 participants).

85.     There were dozens of different types of entities in which the money raised for the Merendon Mining investment opportunity was used to support the other business opportunities of Sorenson and Brost. Those companies for which investor money was raised and went into are those identified on Debtor's Schedule B, Item # 13, and the schedule attached to the same. Of those funds, some went through US Bank, while others reached those other companies through different bank accounts and platforms around the world. There are additional properties that are in Canada, Central and South America.

86.     With regard to the Canadian properties, the property which was owned in Canada by Strategic Metals Corporation ("Strategic Metals") has been seized and sold by a Canadian receiver. Arbor (Arbour) Energy, Inc. ("Arbour") was purchased and then gutted with the cash going to Sorenson in the form of a $36 million loan. To my knowledge nothing has been paid on this loan or returned to the membership.  It is my understanding that amongst the assets associated with these investments was a magnetite mine in Canada that is still producing substantial magnetite ore. Much of the source of this information came from my review of Strategic Metals and Arbour documents and conversations with insiders of those entities.

87.    I have been informed by several sources, including Taylor, that both Brost and Sorenson were virtually penniless in the late 1990's when they got together and formed what would become the Merendon Mining entities. During the course of my association with the Brost/Sorenson group, I was told on several occasions by both Brost and Sorenson that they had started out in the late 1990's with a minimal capitalization and that everything that I was observing had been built up by the two of them over the years prior to our meeting. I would say that the bulk of their real growth began in 2002 and 2003 because that was when they were promoting, purchasing, and developing the Merendon Mining properties here in the United States.

88.    Brost's part in the venture was to run Capital Alternatives which was to be the member network and the sales force. Once the participants were found they became a part of Capital Alternatives, later IFFL, by investing in several different projects such as Strategic Metals, and other Canadian based investments.

89.    In 2001 and 2002, when I first met Brost, the American Merendon Mining entities were not yet part of the formula, neither were unnumbered accounts, such as SGD. The principle gold mining operation was in Honduras, and Sorenson was presented as a person of substance because he had developed gold mining property in Canada and was at this time deeply involved in the opportunities that he had discovered in Honduras and other South American countries.

90.    During 2001 and 2002 Brost's scheme was to set up a sales operation utilizing a structure consisting of structurists, strategists and bird dogs. The sales operations were headed up by Capstick. At its high point it appears that there were about 400 structurists, strategists and others within the sales chain. The list of structurists is

attached as an exhibit hereto. The sales chain took about 25% of all investor money for sales commissions and overhead with the other 75% either going into the various projects or otherwise being siphoned off by Brost, Sorenson and others for expenses. It was during this period that the participants were encouraged to set up their companies offshore, principally in Belize, and to list themselves as "Managers" for tax purposes.

91.    It was in 2002, that Brost first began the process of bringing Merendon Mining into the U.S. to develop mining properties in Colorado, Nevada, and California. At this time, participants were given the opportunity to invest their money into the development of these Merendon Mining properties with the guarantee of a substantial return as the development reached the production stage. Brost stated in at least one of the seminars that I attended that he was hoping to develop these entities for sale to larger mining operations. Thus, if he could prove up the mining property to the $1 to $5 billion level, then a larger company could step in to purchase the property and the investors could benefit more quickly with immediate cash from the sale. There was never any concern that the investors' royalties or monthly reimbursement on investment would be jeopardized or might end.

92.    Some of the initial participants with Brost in the early years of Merendon Mining were Kendall, Adair, Chris Houston ("Houston"), Joanne Assen ("Assen"), and Edna Michelle ("Michelle"). It was around the time of the start up of the American Merendon Mining companies that Capital Alternatives ceased to exist as a participant vehicle and IFFL came into existence as its replacement. All of the investors in the Merendon Mining gold mining operations, whether they were American or foreign, had to join IFFL.

93.     It was also at this time that a fund called the "SOD Fund" was developed and investors were given numbered bank accounts from which they could monitor their investment returns, if they chose that form of investment. Also at that time, the secondary investments, such as the collection upon credit delinquency were either dropped or were not presented as a part of the IFFL package, with all of the focus being on the Merendon Mining ventures.

94.     As of July, 2, 2003 Brost also created a Mining Interest Development Action Strategy ("MIDAS") program, and opened a MIDAS Fund office in Fort Lauderdale located at Corporate Office, Suite 300, 1451 W. Cypress Creek Road, Fort Lauderdale, FL. Brost and other structurists used that office to conduct sales seminars to potential investors within the U.S.

95.     On May 2, 2008, Debtor's Officers and Directors issued a memorandum to the investors indicating Debtor's default on its promissory notes to them, and advised its investors that Debtor, along with its subsidiaries in Colorado, Arizona and California, was changing its name to US-WEST Mining (Nevada) Corporation. (See attached notice of default). In its notice of default, Debtor offered its investors the option to convert their notes to an annuity paid by an insurance company created by SGD or to renew their notes, and then proceeded to describe the litany of then pending government administrative and criminal investigations and proceedings brought against Debtor, its affiliates, its principals, and management.

## PENDING ADMINISTRATIVE AND CRIMINAL INVESTIGATIONS

96.    Both Brost and Sorenson have histories dating back to 1998 with the ASC for a number of violations, including fraud, lying to investors and trading in securities while not being registered with the commission.

97.    I am aware of these various investigations and proceedings described below herein as a result of Atlantic and myself having been subpoenaed to produce documents to these various investigative agencies, my review of the records to be produced, and public documents associated with those investigations, and conversations with some, but not all of the investigators, in the matters described below herein.

98.    ASC investigations into Merendon Mining Corporation Ltd. ("Merendon Canada"), Strategic Metals, Arbour and the Institute for Financial Learning Group of Companies Inc. (another name for IFFL) have been ongoing for years, with a number of penalties and trading bans being issued over the past decade. Amongst the respondents to the ASC actions were Brost, Sorenson, and Regier, as well as directors Edna Forrest and Carol Weeks.

99.    Brost, Sorenson, Regier, and others have not only been sued by the ASC, but are under criminal investigation by both Canadian and United States authorities.

100.    The Internal Revenue Service ("IRS"), in conjunction with the Department of Justice ("DOJ"), had been conducting an investigation of Debtor in connection with the MIDAS program. This investigation then expanded to include the program surrounding Debtor's issuance of promissory notes to its investors, including IFFL and SGD's role in the same, along with the management of each of those entities, and the

investigation apparently also includes a grand jury investigation brought by the DOJ in the Eastern District of New York.

101.    Two civil suits have also been brought in Houston and Seattle by the DOJ against accounting professionals to bar them from promoting the MIDAS program as an unlawful tax scheme involving bogus gold mining deductions involving Debtor and IFFL.

102.    The Colorado office of the Securities and Exchange Commission (the "SEC") also has a pending investigation against Debtor, its subsidiaries, affiliates and management, arising from violations of U.S. securities laws arising from Debtor's fundraising.

103.    On March 21, 2008, the State of Washington Department of Financial Institutions, Securities Division, has also brought actions against The Institute For Financial Learning Group of Companies, Inc.; Strategic Metals, Inc., Merendon Mining Corporation, Ltd., Milowe A. Brost; Ward K. Capstick; Kristina J. Katayama; Ronald R. Case; and Warren L. Bosma, who also comprise Debtor's officers and directors, and other accounting professionals, with respect to the sale of unregistered securities in that state.

104.    In March 2008 the Canadian Revenue Agency launched simultaneous raids on key IFFL figures.

105.    As part of a class action lawsuit brought by defrauded investors, on September 22, 2008, a Calgary Court appointed Michael Quilling as Receiver to recover the remaining assets from Strategic Metals. The money held by Strategic Metals has been seized by the receiver appointed over it in Canada. Strategic Metals and IFFL records

were kept in their offices in Calgary, yet were seized by Canadian regulatory authorities in 2005.

106.    On September 15, 2009, Brost was taken into custody and arrested by the Royal Canadian Mounted Police ("RCMP"), at which time an arrest warrant was also issued for Sorenson by the RCMP.

107.    This fact, and what is also conveyed herein regarding these investigations is public knowledge, and available in the public record.

### SORENSON'S PURPORTED DISASSOCIATING HIMSELF FROM BROST

108.    Following the commencement of all these investigations and proceedings, Brost started moved all other funding, including the monies in the US Bank accounts in Colorado, from one bank to another, where I last saw the monies had been transferred into Nordic Bank.

109.    By 2006 Werner stepped in and began seeking a stock offering or deal that would put aside the IFFL membership that had invested for a monthly royalty or return with the Merendon Mining program and also would allow funding from stock trading. It was at this time that Sorenson became concerned about the ownership of the Merendon Mining property by the IFFL membership, and by mid 2007 I was told that Sorenson was distancing himself from Brost.

110.    During this 2006 to 2007 period, Werner began working directly with Sorenson. It is during this time that various companies were formed by Werner which I believe were formed to bring the IFFL membership investment under Sorenson's control. As of today, Brost claims that Sorenson has all of the money and has left Brost and Brost's investors out to dry with no cash flow.

111.     With reference to the alleged split between Brost and Sorenson it apparently stems from complaints by Sorenson that Brost has used some of the collected funds for purposes other than those approved by Sorenson. Sorenson instructed Werner to write a letter to all investors in SGD (now Bahama Resource Alliance) notifying them that Sorenson was ostensibly trying to distance himself from the American Merendon Mining operations and claiming that he is not responsible for those investors. Sorenson has also claimed that the only operation that he had with Brost was the Merendon Canada and Merendon Central and South American Operations. This is also untrue in that Sorenson is listed as a Director in Cyprus for the 360 Earth Resources Foundation which he and Brost formed together in 2003 to shelter money from the entire Merendon Mining operation. For this purpose, Sorenson gave me a copy of his passport to be used in the forming of that corporation and also as a part of my due diligence background research on the Foundation membership.

**[Intentionally left blank]**

## HARM TO THE INVESTORS

112.    I have had direct communication with many of the investors in Atlantic's capacity as their income tax preparers. They are all in the same position; i.e., that Brost and his sales staff convinced them to mortgage all of their properties and give Brost and Sorenson all of the financing proceeds with promises from both of them that they would all be receiving a monthly cash flow that would be more than sufficient to allow them to meet their monthly incurred obligations. Now all of these investors are stuck having to pay the incurred indebtedness without receiving any of the promised cash flow. Some of the investors have already lost their homes and farms and one female investor has committed suicide in Canada. As the days and weeks go by there is more and more anguish from this large body of investors.

113.    Many of these investors are taking matters into their own hands, and have created "Investor Recovery Groups" whereby they solicit investors for money to be used to fund a private investigation into all these matters, and try to recover the assets stolen from them by the perpetrators of this fraud, and bring them to justice. However, many of these so called private investor groups are no more then fronts run by former structurists who are attempting to deflect their own potential civil or criminal liability from themselves, and are in fact interfering in attempts to recover monies on behalf of these investors.

114.    Lastly, these investors are further harmed because of substantial tax liabilities they are incurring notwithstanding that they documented their substantial losses from these schemes. Currently the Internal Revenue Service ("IRS") and various state tax regulators are still attempting to tax all of the participants for their participation in these investments even after their loss is evident. While the IRA rollovers have recognition by the IRS as legitimate; however, there

are still difficulties since the IRS will not allow a theft loss deduction without a final

determination of loss by this Court. Without conclusive evidence or a judicial determination that

a loss exists the IRS will not allow the investors a theft loss deduction.

FURTHER DECLARANT SAYETH NAUGHT.

_____
PAUL GARFINKLE

STATE OF FLORIDA                    )
                          BROWARD    ) ss.:
COUNTY OF ~~PALM BEACH~~              )

THE FOREGOING instrument was acknowledged before me this _17th_ day of

September, 2009 by PAUL GARFINKLE, who is personally known to me or who has

produced _Fla. DL_ as identification and who did/did not take an oath.

_Patricia Tomlinson_
Notary Public, State of Florida
My Commission No: _DD684009_
My Commission Expires: _8/26/2011_

NOTARY PUBLIC-STATE OF FLORIDA
Patricia Tomlinson
Commission # DD684009
Expires:  AUG. 26, 2011
BONDED THRU ATLANTIC BONDING CO., INC.

\351016\4 - # 504559 v1