UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                    ) CASE NO.: 09-11958-BKC-AJC
                                          )
MERENDON MINING (Nevada), INC.            )
a/k/a Milowe Brost                        ) CHAPTER 7
                                          )
        Debtor.                           )

## DECLARATION OF PAUL GARFINKLE

STATE OF FLORIDA          )
                          ) ss.:
COUNTY OF ~~PALM BEACH~~ BROWARD  )

BEFORE ME, the undersigned authority, this day personally appeared PAUL GARFINKLE, the ("Declarant"), who, after being first duly sworn, deposes and says of his own personal knowledge:

1. I am over the age of eighteen (18), and am competent to provide testimony as to, and have personal knowledge of, all matters set forth herein.

2. The basis for my own personal knowledge of the facts set forth herein arises from my own personal observations, conversations with the persons referenced throughout herein, in particular Debtor's insiders and affiliates, as identified herein below, and my access to and review of corporate documents of the entities referenced herein. The circumstances and manner in which I was provided access to those documents and individuals is described below herein.

3. I reside at 5629 American Circle, Delray Beach Florida 33484, which has been my home since 1993.

4. I have been asked by Marcia Dunn, the Trustee (the "Trustee") in the Merendon Mining (Nevada), Inc.'s ("Debtor") involuntary bankruptcy proceeding (Case

No. 09-11958 Southern District of Florida) to provide to the best of my knowledge and recollection a general overview of the background behind the filing of this involuntary bankruptcy, and Debtor's operations, management, assets and history.

5.  I have been offered no inducement, nor have received any incentive, monetary or otherwise, from either the Trustee or any law enforcement officials, with respect to my cooperation in affording this testimony and declaration. I make this declaration on my own free will and volition.

## PERSONAL BACKGROUND

6.  I graduated from Boston University in 1961 with a Bachelor of Science Degree. I majored in Accounting with a minor in Economics, and thereafter graduated from its law school in 1963 with a Juris Doctor degree.

7.  I was admitted to the Massachusetts Bar in 1963 and maintained a law practice in the Boston area continuously from 1963 through 1981.

8.  In 1969, I became associated with attorney George Osserman, where we eventually formed a partnership under the name Osserman and Garfinkle, and eventually added another partner, Frederick Cains, when the name of the firm was changed to Osserman, Cains and Garfinkle.

9.  Upon moving to Florida on a part time basis in 1975 and on a full time basis in 1977, I was also affiliated with a law firm in downtown Miami, called Osserman, Garfinkle and Greenfield for a period of about three (3) years, and then went into business in accounting here in Florida.

10. In 1976, my Boston law firm was counsel to a large coal mining tax shelter program located in the Gillette, Wyoming area, which led to an IRS investigation of our firm in 1977.

11. While I do not admit I engaged in the conduct for which I was charged, I feel nonetheless compelled to let the Court know that on November 18, 1980, my partner Osserman and I plead guilty to conspiracy, mail fraud, and aiding the filing of false tax returns of others and we each were sentenced to serve one year in jail. I of course subsequently lost my license to practice law as a result.

12. After I returned from jail, I then went into the accounting support businesses as a sole practitioner in the Ft. Lauderdale area where I practiced accounting, bookkeeping services and business consulting services.

13. On November 17, 1989 my former partner, Osserman and I were indicted for a fraudulent boat tax shelter scheme, and again while I do not admit I engaged in the conduct for which I was charged, I feel nonetheless compelled to let the Court know that I plead guilty on March 13, 1996 together with pleading guilty to a Utah case charging me with money laundering for which I was charged on March 16, 1994. This conviction was as a result of combining the open Ft. Lauderdale, Florida case with the instant Salt Lake City case in which I was arrested in Salt Lake City, Utah. This combined case was a part of the Salt Lake City, Utah case where I was charged together and received five years probation. I was subsequently charged with violating the terms of the supervised release in that case and was sentenced to two years in prison. My term of imprisonment was completed in 1999, and my probation was completed in 2002. I have had no further involvement with the criminal justice system since that date.

14. Notwithstanding my prior criminal convictions, the matters I am testifying to herein are true and correct and based upon my own personal knowledge of facts I have witnessed, documents I have reviewed and conversations in which I was present and have partaken.

## ATLANTIC

15. When not serving my sentences as described above, I was self employed and practiced accounting support services as well as business consulting by myself until March 14, 2001 when Atlantic Avenue D.B. Financial Legal Support Group, Inc. (hereinafter "Atlantic"), was formed, and which was owned by a friend of mine, Lyndha E. Evensen ("Evensen") and her family.

16. I have acted as a business consultant to Atlantic and others and am not an officer, director or shareholder of Atlantic. The sole officer and director of Atlantic is Evensen. The shareholders of Atlantic are Evensen, members of her family and her family trust.

17. The nature of Atlantic's business was basically legal and financial support to individuals and companies and helping them develop small business opportunities. Both prior to and since joining Atlantic, I have and continue to perform accounting services for their clients, which basically consists of tax return preparation, preparing books and records, reviewing books and records, giving their clients business advice, and reviewing business proposals. Atlantic has existed as a business services organization offering business advice and support for individuals and small business entities since March of 2001.

18. My recollection has been recently refreshed by a review of various documents which are present in my files and those of Atlantic and which have been provided to the accountant for the Trustee.

19. Atlantic and I have assisted both the Merendon Mining entities and members of the Institute for Financial Learning, Inc. (hereinafter "IFFL") in a clerical and advisory capacity since 2002.

20. IFFL has an address at Suite 314, 1212 31 St. Avenue N.E., Calgary, Alberta T2E 7S8. The telephone number for IFFL was (403) 243-5070.

21. Our principle duties functioned around member support of the IFFL members. We acted as tax preparers for those United States IFFL members who retained Atlantic and provided some business assistance to them.

## FIRST MEETING WITH BROST

22. I first met Milowe Allen Brost ("Brost") sometime after September, 2001. I was introduced to Brost by April Pollack-Okin ("Okin"). She invited me to attend a presentation by a financial planner to be held at the Bankers Club in downtown Fort Lauderdale, Florida. Brost was giving a lecture on maximizing returns on capital. At this financial workshop which Brost called his "Institute" I first saw Brost teach the Institute's members on how to maximize their assets by moving them from non-performing to performing assets.

23. The clear goal of the presentation was to raise money from the people who participated in the seminar and convert them into investors in his businesses. He did not call them "investors" but "participants" and hereafter for purposes of this document I have used the terms "investors" and "participants" interchangeably. He did this by

5

showing investors that he could provide them with a 37% annual return by leveraging their passive assets, primarily the equity in their homes, and thereby assure them of their financial freedom. In his presentation Brost stated that if a participant in his investment scheme borrowed equity from their home, business, IRA or any other non-performing asset and invested it with him, they would see that money earn about a 36% annual return on those funds. And if the cost of borrowing was say 10% they would see a net return of 26%. Still if the participant were to let that money grow, the compounding interest reinvested would allow the participant to achieve financial freedom in between 5 and 10 years. This was the essence of the Brost presentations.

24.     Brost also told his audiences that they had a choice of different investment vehicles. The vehicle through which this opportunity was offered was Capital Alternatives, which later became IFFL. His company Capital Alternatives, and later the IFFL, had many investment programs that would bring annual returns on investment of between 15-36% to its investors. Those programs, even before the purchase of the domestic U. S. mining property, included gold mining projects in Honduras and Canada, a defaulted credit card debt program and other similar programs. One such later vehicle was convincing investors to rollover their 401K investments into the IFFL portfolio.

25.     These programs morphed and changed as the time rolled by, but the gold mining operations always remained as the backup assurance of investment success and security for the participant. Brost would continuously represent to his audiences that all investment dollars which he and his various companies were receiving from investors were fully secured and either backed by gold reserves which were held in the Brost and

6

Sorenson vaults at the Merendon Mining refinery in Honduras or other securitized investments.

26. At the time of my initial meeting with Brost the "Institute" was called Capital Alternatives, Inc. ("Capital Alternatives"), but would later also become known as IFFL. The Brost investment enterprise began as Capital Alternatives, and then later the IFFL was formed as a substitute vehicle for servicing Brost's program goals and participant investors. Brost and Sorenson created multiple corporations that they have used in the pursuit of their purposes and schemes. This information was relayed to me by Brost and Larry Adair ("Adair") and documents provided to me by Brost supporting the same.

27. Each participant not only made investments as directed by Brost, but they were also told to set up their own corporate entity from which they would draw salary as a corporate manager. Brost and Sorenson caused multiple Canadian corporations to be formed for each investor and had each of the investors as manager of their own corporation. There are literally hundreds of these companies. However, these corporations were not managed by the participant because in reality Brost and his company managed the investment of the funds. Later, this structure would change, especially when Canadian legal authorities started investigating Brost. This information was conveyed to me by Brost, investors, and my review of company and individual tax filings and documents.

28. The initial presentation I attended was to a small group of no more then four people, and while I didn't initially seek Brost out, following the presentation he and I began to talk about what each of was doing in our respective business ventures and how

we could work together and create synergies in our efforts. At the time of the first seminar, I did not make an investment with Brost, but from that meeting I would continue to have further detailed contact with Brost, and develop a relationship with him whereby I became privy to some of the inner workings of his various interconnecting enterprises and investment vehicles, along with the details of their operations, assets and relevant participants.

## THE MERENDON MINING ENTITIES

29.    After that first seminar presentation, I invited Brost and some of his traveling party to meet with me at my home office in Delray Beach, Florida. He brought two or three of his business associates with him. This was my first sit down meeting with Brost. At that meeting, Brost, and his associates, described for me in detail the nature of the investments that Capital Alternatives was making on behalf of the investor body. There were different business opportunities; some in mining, some in defaulted credit card debt recovery programs, and a couple of others that I don't remember off hand. At that particular time he and Capital Alternatives were involved in mining investments. We got involved in a discussion about mining properties. He told me that he was working with a gentleman named Gary Allen Sorenson ("Sorenson"). He told me that that they (he and Sorenson) were mining for gold in gold mines located in Calgary, Alberta, Canada, and that they were developing these gold mines for investment through a Canadian company, called Merendon Mining, Inc. (the "Original Merendon"), through a subsidiary or affiliate called Merendon Mining, Canada, Inc. ("Merendon Canada") both also located out of Calgary, Alberta, Canada.

30. I told Brost about some gold mining property that I was involved in through one of my clients. At the time I was holding a Power of Attorney for a long time client of mine over some gold mining properties in Colorado, and I let Brost know that I had a gold mining opportunity here in the United States along with a silver mining opportunity in Colorado. He had some interest and we began to discuss Brost possibly acquiring those assets for some of his programs, through his Merendon Mining investment vehicles. He wanted to see some of the reports and paperwork on these opportunities and after this initial discussion I arranged to have those documents delivered to him. I sent to him geologist reports and information concerning the mining opportunity, maps and other supporting documentation. The name of the mine was The Glory Hole, also known as Chain-O-Mines, located outside of Denver in Central City, Colorado (the "Glory Hole Mine"). The title to the Glory Hole Mine was in litigation between Harold Caldwell ("Caldwell") and Judge Robert Barnes, and I presented the Glory Hole Mine to Brost as an opportunity for Capital Alternatives, and the related Merendon Mining ventures, to acquire an interest for the benefit of their investors.

31. Not only did Brost express an interest in becoming involved with that property, at that meeting he also asked me to consider joining the Brost team in various capacities. Thereafter I was in frequent communication with Brost and members of Brost's corporate team. I was requested more and more frequently to assist Brost in clerical, business and other duties as required by Brost, which usually consisted of assistance in due diligence with respect to mining acquisitions, contract drafting and negotiations with sellers.

9

32. After I sent him the information, he responded that he wanted to go ahead with acquiring the Glory Hole Mine for the Merendon Mining investments and he said he would fund the litigation as well as the ongoing operations. These conversations continued through 2002 into early 2003. He did not tell me how he was going to fund the litigation and operations of the Glory Hole Mine, just that Sorenson and his investment group, through one of their Merendon Mining investment vehicles, would fund the litigation and thereafter develop the mine. At the time, I had no knowledge if the funds were coming from investors or not, though I later came to learn that was the case. They eventually did however fund some of the litigation through an entity called Merendon Group Encumbrance ("Merendon Encumbrance").

33. What I did come to learn from Brost later was that the monies to fund the litigation with regard to the Glory Hole Mine and to acquire the other mines were coming out of investor money. In particular the monies used to acquire these mines where the monies that came from the investors of what eventually turned into Debtor, Merendon Mining (Nevada), Inc. The investor money he raised was through Capital Alternatives, which became IFFL, and which was the vehicle they used to introduce the programs to investors, but they actually used different interrelated sub-entities to actually raise the money. However, Glory Hole was later transferred into the name of Sentinel Mining Corp. ("Sentinel"), a newly formed Colorado corporation of which Brost was the officer and director, in which I later became its Registered Agent. I became aware of all this through my direct involvement in the Glory Hole purchase, Sentinel, conversations with Brost, and review of Debtor's documents.

34. Ward Capstick ("Capstick") from Seattle, Washington was the original registered agent for Sentinel until I replaced Capstick as the Registered Agent. Capstick served as Brost's right hand man, and ran the sales operations for all the Brost and Sorenson companies, including all the Merendon Mining ventures. My source of knowledge for this information came from Brost, Sorenson and Capstick and my review of the relevant corporate documents supporting the same.

35. In either late 2003 or early 2004, Brost hired Bradley Regier ("Regier") as his treasurer and chief financial officer for the Merendon Mining project and ultimately Regier became his CFO for all matters.

36. Through my conversations with Brost, Sorenson, Capstick, Regier and others working with and for them in these investment vehicles and opportunities, I came to learn and become intimately familiar with the companies formed in the United States, and other countries, including Canada, Honduras, Ecuador and Peru, under different derivations of the name "Merendon Mining" by Brost, Sorenson and others. Those Merendon Mining entities are those entities with the Merendon name set forth in the exhibit to Debtor's Schedule B, Item # 13.

37. I have provided to the Trustee, and her financial advisors, documents in my possession that I received from Debtor, that support that every one of these Merendon Mining corporations, and the other companies identified on Exhibit 1 to Schedule B, Item # 13 of Debtor's schedules, were an alter ego of Debtor.

### MY VISIT TO CANADA

38. In 2003, Evensen and I were invited to meet with Brost in Calgary, Alberta, Canada so that we might see the Merendon Mining and other Brost operations

11

and meet members of his staff. However, only I went to Calgary, where I met Brost and his wife, Elizabeth. At that time, I learned that Elizabeth was a partner with Milo in the business operations and was the secretary of some of his various companies. However, some time in or around 2005 the Brosts got divorced and their assets were divided so that Elizabeth would receive their family compounds in both Honduras and in Calgary.

39.   A short while after the visit to Canada, Brost introduced me to Sorenson, who was also from Calgary, Alberta, Canada. Brost informed me that Brost and Sorenson were 50/50 partners in a Canadian mining operation, which was identified above as the Original Merendon. They supposedly had a mining operation in Canada, and a refining operation in Honduras. Later on, sometime in 2004, I was invited to view the Honduras operation with some of the IFFL members.

## MY VISIT TO HONDURAS

40.   When the IFFL members and I arrived in Honduras for that visit, Brost and Sorenson put on a presentation for the assembled group. In their presentation they explained how Sorenson's mining operation could afford to pay investors a more than 30% return on their money by utilizing private as opposed to bank money and that all of the investor money was secured by gold bullion that was stored within the vaults at the Honduras refinery. Sorenson made a point of informing the assembled people about the extent of money that Milo and his sales groups had made available for the mining operation and that they both had become extremely wealthy as a result of all of the investor money that was being funneled into the Sorenson/Brost mining operations.

41.   Sorenson thereafter took the assembled parties on a tour of the refinery. He showed the assemblage a rolling cart with gold in various forms on the shelves of the

cart. Sorenson then told the assemblage that the value of the gold on the cart was over $1 million. This refinery was a part of a huge guarded complex in Tegucigalpa, Honduras. The whole facility was remarkably clean and fully equipped with the latest state of the art equipment. It must have had a cost of millions of dollars to set up that operation.

42. Sorenson then took the assemblage on a tour of his jewelry operations and explained that some of the gold which he was refining was being used to create and design custom jewelry. Sorenson said that the mining operation had a retail jewelry outlet connected with the refinery and invited all of the participants to view the jewelry on display in the store. He took the participants into the store so they could meet with his staff and, if they wished, they could buy some of the jewelry from his shop.

43. Some of the participants did in fact buy some of the jewelry from Merendon Mining there in Honduras. Upon taking these purchases back to the United States several of the participants had their purchases assayed out of curiosity. I was told by some that the jewelry that they had purchased was overpriced and not of the quality as represented. Upon completing the various Honduran tours, Sorenson and his wife Thelma invited the assemblage back to have a final dinner at his home.

44. Sorenson's home in Honduras is a very large complex with several buildings on the property and sits on the top of a mountain overlooking the city of Tegucigalpa. It is surrounded by a huge fence with about 48 armed guards, has a four story waterfall, a separate movie theatre, a separate dining room building with a large wood table that seats 48 around the table, many artifacts, statuary, etc. It is my estimate that the property is worth $40 million. Sorenson told me that he owned the property without any mortgage.

45.     Throughout the entire trip there was constant conversation between Sorenson, Brost and these investors, a lot of which I overheard. Sorenson and Brost would each tell the assembled participants that Sorenson owned 90% of the business and that Brost had 10% of the participation. This was in conflict with the prior statements that they made to me that they were 50/50 partners in all of the operations. However we all repeatedly heard and were told by them that Sorenson and Brost were together in the deal.

46.     I was also told by Brost and Sorenson that sometime in 2002 Brost had loaned Sorenson $4 million for the development of plant and equipment on the Honduras property.

## MERENDON MINING IN THE UNITED STATES

47.     The first Merendon Mining company in the United States was formed around 2002, in Colorado, with the name Merendon Mining (Colorado), Inc. ("Merendon Colorado") to begin to develop the Glory Hole Mine and other Colorado mining opportunities. However, there were other previous companies or ongoing companies that were all part and parcel in the overall Merendon Mining, Brost and Sorenson operation. The purpose of the initial American Merendon Mining company was to take over the Glory Hole Mine and enter into contracts with Caldwell. This first Merendon Colorado entity was also to be used to acquire another Colorado property called the Silver Plume Mine (the "Silver Plume Mine") then owned by Abe Barnhart ("Barnhart"). Again the source of my knowledge regarding these matters is from my active involvement with these mining ventures, review of the relevant documents associated with the mines and

companies, and my conversations with Brost, Sorenson, Capstick, Regier, Camp and other insiders and affiliates of Debtor, and related and subsidiary companies.

48. Due to my role in helping develop the Glory Hole Mine, I was provided copies of the various corporate paperwork and documentation, and was quite familiar with Merendon Colorado, and its successor entities. Not only had I reviewed the documentation of these corporate entities I also assisted in the preparation of their tax returns as well. At no time, however was I an officer or director of this company. However, to my best recollection, at its inception, the officers and directors of Merendon Colorado were just Brost and his wife, Elizabeth.

49. Sorenson, had his personal lawyer from Fort Lauderdale, Adair, working for and involved with the entity, and was involved in its creation and formation. He had been involved in setting up some trusts for Sorenson. I am not sure if he did Merendon Colorado's actual corporate formation or was an officer or a director, but Adair was actively involved in most aspects of Merendon Colorado.

50. Brost and Sorenson also hired another Florida attorney Martin Werner ("Werner") who lived at 8911 Collins Avenue, Unit 1204, Surfside, Florida 33154 to represent Brost and Sorenson in various legal matters pertaining to both the Merendon Mining and IFFL issues. Werner had previously represented Atlantic and me as our lawyer, and we had introduced him to Brost. Werner's brother facilitated the purchase of a condo for them in the ICON building located at 450 Alton Road, Miami Beach, Florida 33131, Suite 2903, which would then serve to become Debtor's corporate headquarters. After that purchase Wemer and his brother also moved into the ICON building.

15

51. Later Werner moved to Panama when he became the legal confidant and representative for Sorenson. I have reviewed correspondence showing that Werner was the President of a Bahamian company owned and controlled by Sorenson called Syndicated Gold Depository S.A., which is now known as Bahama Resource Alliance, Ltd. ("SGD"), SGD was developed in response to the changing financial situation within the IFFL and the need for Brost and Sorenson to find new ways to bring in investors, participants, members, and money for their enterprises. The source of this information came from Werner, Brost, Sorenson and other insiders and affiliates of these entities.

52. Brost told me that he had formed Merendon Colorado, but that it was the first of several interconnected and intertwined Merendon Mining corporate entities established for the purposes of acquiring the American gold mines and operations, and their related offshore manufacturing or smelting facilities. He had told me he was going to have this company, Merendon Colorado, and other similar type companies formed for the purposes of acquiring interests in these mines, and he subsequently did do so.

53. Brost and I discussed the formation of what is now Debtor, Merendon Mining (Nevada), Inc. a Nevada corporation. I am quite familiar with the intricacies of its formation, operation, assets, structure, investors, management and functions through my extensive conversations with Brost and other corporate insiders of Debtor including Sorenson, Capstick, and Regier. I have also reviewed Debtor's corporate paperwork, and tax ID number application form and other similar documentation.

54. While I did not prepare Debtor's tax returns, those were done by an accountant William Camp ("Camp"), I did review them and oversaw their preparations, and am quite familiar with those documents. Brost hired Camp, whose address is

Universal Business Systems, Inc., 344 8th Street N.E., Washington, D.C. 20002 as the Certified Public Accounting firm for the Merendon Mining entities. Camp prepared the corporate tax returns for the various Merendon Mining companies for the years 2005 and 2006. Atlantic and I became more and more involved in the preparation of member tax returns because Camp needed additional support.

55. Debtor was set up to be the holding company for all the American Merendon Mining acquisitions. Brost and Sorensen acted together as sort of co-chief financial and co-chief operating officers, and in such capacity they controlled this and all the other Merendon Mining operations, both in the United States and abroad. The two of them were the singular active participants, the directors and the parties in complete control over all of these interconnected and related entities' affairs. These facts were provided to me through conversions I had directly with Brost, Sorensen, and Camp. I personally attended about four meetings of Debtor during which the information set forth in this affidavit regarding Debtor was conveyed to me by all three of them. In fact, Brost and Sorenson each told me on repeated occasions that all of the properties and companies were under the direct and strict control and supervision of the two of them, who along with members of both their families held their interests through closely held partnerships. While I assumed that Brost was paid by Debtor, I do not specifically recall whether he received a salary.

56. Merendon Colorado was to merge into and become part of Debtor, which did in fact subsequently occur. The manner of how this occurred was that Debtor Merendon Mining (Nevada), Inc., a Nevada Corporation, subsequently changed its name to Merendon Mining (Colorado), Inc., a Nevada corporation. This was done through the

Nevada Secretary of State. (See attached Notice of Default of Promissory Notes and the Secretary of State filings indicating the same). Debtor and Merendon Colorado now have the identical name; they just have different states of incorporation, but were intended to be one and the same entity.

57.  Brost told me that all the bank accounts were maintained at US Bank in Colorado, and that all of the investor monies were initially deposited into those accounts. They also told me the money to buy these various mining properties came from investors, which I was able to independently verify because many of the investors subsequently became accounting and tax clients of our firm, Atlantic, and I was able to personally confirm this fact through my review of copies of the investors' wire transfers, contracts and other documents with the Merendon Mining entities, and Debtor in particular.

58.  The funds to acquire each of the American mines for the Merendon Mining companies (in Colorado, Arizona, California and Nevada) came through US Bank in Boulder, Colorado under Debtor, Merendon Mining (Colorado), a Nevada corporation, into which accounts investor funds were deposited, commingled and used to pay a variety of expenses for each of the separate mines owned or to be acquired by each of the separate companies. Brost told me that while originally the US Bank accounts were opened in the name of Merendon Colorado, a Colorado corporation; Merendon Colorado was supposed to, and did become part and parcel of Merendon Colorado, the Nevada corporation, who is the Debtor herein, and that Merendon Colorado, and all the other Merendon Mining entities were all to be operated as a single entity under Debtor as the umbrella corporation, whose goal was to acquire mining properties and then put them into operation, get the gold concentrate, and then send the gold to Sorensen in Honduras