for processing by Merendon de Honduras S.A. de C.V. ("Merendon Honduras"), the refinery owned by Sorenson, where the smelting and manufacturing of the gold would take place. All of this information came to me from my conversations with Brost and a review of the accounting records maintained by Camp.

59.     Debtor, under different corporate umbrellas, would be the entity to acquire these various mining operations. There are four American based Merendon Mining companies: (1) Debtor, Merendon Mining (Nevada), Inc., a Nevada corporation, which later changing its name to Merendon Mining (Colorado), a Nevada corporation, (2) Merendon Mining (Colorado), Inc., a Colorado corporation, (3) Merendon Mining (Arizona), Inc., a Nevada corporation and (4) Merendon Mining (California), Inc., a Nevada corporation. Each of the companies had interests in or acquired or had contracts to buy various mining properties within the United States.

60.     All five of the mines listed on Debtor's Schedule A were purchased with investor money, raised through Debtor, placed in Debtor's accounts at US Bank in Colorado, contracted for by Debtor, notwithstanding what name the title to the mines was eventually taken.

61.     For example, "Discovery Day" was purchased by Debtor through its wholly owned subsidiary, known as Merendon Mining (California), along with Merendon Mining of Arizona, which was formed to acquire the mine in Dolen Springs, Arizona that is called "Gold Basin", and the Bueno and Black Rose Mining properties are located in Jamestown, Colorado, and taken in the name of Merendon Colorado. Debtor paid about $3 million to Pat Fagen towards the purchase of the Discovery Day mine in Discovery Day, California.

19

62.    All of the Merendon Mining entities had the same employees, and all employees served the same role and function no matter which entity for which he was performing a particular task. Les Taylor ("Taylor") had previously worked with Sorenson in his other operations and came to work for him as Director of Mining Operations for all the Merendon Mining companies, particularly the American companies. In that regard, Taylor worked for all the companies. However those people who physically worked at a particular mine, would work just for that mine, and would rarely visit or perform work for or at other mines. They all would however report back to Taylor. Taylor lives at 274 Castle Creek Road, Grant's Pass, Oregon, 97526.

63.    Throughout the entire period of my association with Brost, Sorenson and their enterprises, it was always stated or made known that Sorenson and Brost had created Merendon Mining, and that the U.S. Merendon companies were all a part of this large worldwide complex run under the Merendon or Merendon Mining name, whether it was in Canada, the United States, or Central and South America.

64.    I have been told by both Brost and Sorenson on several occasions that they formed a separate corporation for each of their entities as they needed them. There was never a clear delineation from company to company as they considered all of the companies as one and the same. They also apparently never cared what the investors wanted to invest in as it was one massive paper shuffle.

65.    Subsequent to my first investor meeting with Brost in Fort Lauderdale in 2002, I attended other meetings where presentations were made to investors. The presentations were commenced by Brost, and Capstick would speak. Sorensen would speak at some of the presentation meetings. These would be regular meetings, mine tours,

and seminars. At each of these presentations, the investors would be told that they were going to get their returns, and that their investments were all backed by gold that Sorenson supposedly had. No differentiation was made between each of the companies. As far as they were concerned this was one enterprise. Whether it was Canada, the United States, or Honduras, it was all treated, and presented to the investors, as one and the same venture.

66.    The investors were not given a choice as to which Merendon Mining entity they wanted their money invested. There was no delineation between the four companies; it was all Merendon Mining. When an investor would go to an IFFL meeting, he or she would be solicited to invest in Merendon Mining, without any distinction between Merendon Mining Colorado, Nevada, Arizona or California. Rather the investor was sold on the singular Merendon Mining enterprise, operated as an umbrella through Debtor, encompassing the entire American, Canadian and Honduras companies and their operations, along with other related entities in the Merendon Mining portfolio of companies.

67.    I am not aware of any oral or written representations or documentation that advised any of the investors that their money was being invested in one Merendon Mining entity over another, or otherwise explained to the investor that their money was being invested to acquire a specific mine. In my review of investors' and Debtor's documents, in my conversations with investors I have done work for through Atlantic, or otherwise have spoken with, or in any of my conversations with Brost, Sorenson, Regier, Capstick or Camp, have I seen or heard evidence indicating which mine or property or company the funds were specifically going to be invested. Funds were raised solely from

21

investors with no investment from the principals. Expenses for the mines were paid without discrimination as to which mine was owned by which company. Whether it was the cost to maintain any particular property, to hire a geologist or retain an attorney for a closing, the principals dipped into the one source and pot of money maintained at the US Bank accounts comprising the monies raised from the investors, regardless of its source, or which company or mine for whose benefit the expenditure was to be made.

68.    For example, I was commissioned to assist in the closing of the Dolan Springs property called "Gold Basin". When I needed to have money transferred to the title company as part of the closing, I would call Brost who would have me speak with Regier, to whom I would give the account information as to where it was to go and then Regier would send the wire transfer to the title company from the US Bank accounts.

69.    I have reviewed Debtor and its affiliates' bank statements and other financial documentation which reflects that the investor money was commingled. This fact was additionally orally confirmed for me by Brost and Regier, who is the chief financial officer for all of the Brost/ Sorenson operations. Company checks were either signed by Brost or Capstick.

70.    The administration arm for Brost and Sorenson's operations in Calgary was run by Steve Kendall ("Kendall"), whose address was 903 B 48th Avenue, S.E., Calgary, Alberta, CA T20 2A7. However, this management has changed several times since about 2005 when Brost began looking for other means of securing investment money for the gold mining operation.

71.    While Brost, Capstick and Regier on their face maintained separate books and records for different companies, the entities were treated as if they were all one

22

enterprise. Kendall had originally maintained the books and records of the companies, but by the end, Regier was the person mainly fulfilling that role. However, within the Merendon Mining scope of companies they were treated all as one set of books. There were no separate books and records for Debtor, Merendon Colorado, Merendon Arizona or Merendon California; they were all the same. This was confirmed through my review of each of the Merendon Mining entities' corporate books and records, including those of Debtor, as these documents were provided to me by Brost, Regier, Capstick, Sorenson and Camp, in connection with my assisting in the preparation of the Merendon Mining entities' corporate tax returns, as well as those of my investor clients.

72.    While I am not sure if a consolidated return was filed, there was an IRS Form 1120 filed. I do remember that there was a lot of discussion within the accounting firm as to how to treat all the different entities from a tax and accounting standpoint, but I don't remember how that issue was finally resolved. Yet, from my own personal observation and knowledge, the Merendon Mining corporate insiders completely and routinely disregarded the corporate formalities.

73.    Notwithstanding that the investor monies were used to finance the acquisition and operations of the five American gold mines, ever since my involvement with the Merendon Mining entities since 2002 the bulk of the investor money went to Sorensen through one of his various companies. Only a small amount of the investor money was ever actually used for the US mining acquisitions. The bulk of the money that was raised by investors to IFFL to acquire mining interests in the United States was transferred to Sorensen.

23

74.    Of the approximately $130,000,000 that was reportedly raised from investors, no more then $30,000,000 went to fund US operations and acquisitions, while about $100,000,000 went to SGD, which $100,000,000 payment was represented by a promissory note from SGD to Debtor. I was told that Debtor's interest in the SGD note was backed by SGD proving Debtor with a profit participation in the South American Merendon Mining These facts were confirmed from a review of the entities corporate tax returns, plus were also verbally confirmed to me by Brost, Sorenson and Capstick on several occasions.

75.    Upon information and belief, conversations with Brost, Capstick, Sorenson and other insiders, investors, clients, structurists and investigators with the Alberta Securities Commission, I became aware that the actual amount of money raised and under management by the Brost/Sorenson operations was between $1.2 to $5 billion raised from between 3,000 to 4,000 investors in Canada, the United States and others worldwide.

76.    In 2005, Brost, Sorenson and Capstick attempted to overcome the legal handicaps presented by an investigation by the Alberta Securities Commission ("ASC") and so as to avoid American law by issuing eight months Promissory Notes to their investors. These notes were issued by Debtor or the Original Merendon. Debtor itself issued almost $150,000,000 in such notes. They restructured the investors' transactions so that their investment would be evidenced by a short term, usually eight months, promissory note issued by Debtor as the maker of the note, to the investor. The investor would advance the funds to Debtor, and it was represented by Brost and Sorensen that

24

these notes would be repaid from the revenue generated by these mines owned by the various Merendon Mining companies.

77.      However, what actually happened was something else. No real money was being made from mining. Some investors were paid off out of new money that was raised from new investors. All told, it is my understanding that only $15 million was ever returned to some of the initial Merendon Mining companies investors. While there was some minimal development work performed on the mines, Debtor's principals, Brost and Sorenson basically just pocketed the money, with most of the funds being siphoned off and funneled to Sorensen, through his refinery, house, and equipment in Honduras. I have personal knowledge of these facts from conversations with these individuals, review of accounting records in preparation of the companies tax returns, personal observations, and my physically seeing Sorenson's refinery and home in Honduras.

78.      Capstick told me that the money invested by investors went into Debtor's US Bank accounts in Colorado, either directly or through an entity called True North Productions, LLC ("True North"), and would be sent to SGD, which monies then would flow from SGD into different bank accounts around the world controlled by Sorenson. While I have not seen the checks I have reviewed bank statements confirming the money flowing first to True North.  The $100,000,000 that SGD took out of Debtor was evidenced by a promissory note from SGD to Debtor.

79.      The equity ownership, through capital stock, of the various Merendon Mining companies, was supposed to be held 50% by Brost and his family and 50% by Sorenson and his family, though the percentages ultimately became 90% in favor of Sorenson and 10% in favor of Brost.

25

80.    I was never a shareholder or officer or director of any of these Merendon Mining companies. Atlantic was supposed to hold an equity interest in these companies, but never was, and instead was provided with an investment account similar to those created for most investors and which was supposedly earning about 30% interest per year.

81.    It was not until about 2006, that I first became aware that the money that was being invested by the various investors was being used for purposes other than as represented to them verbally and in the offering memorandums, promissory notes, and the other literature and during the presentations. Word was getting out on the internet about Brost and Sorenson's similar earlier ventures and that Canadian authorities were beginning to investigate their activities in Canada. The buzz from investors and the internet was that this was a scam and rip off and I wanted to get to the bottom of it.

82.    When I first found out that the funds were not being used for the purposes it was intended, I confronted Brost and Sorenson about it, and they denied it, but I have been able to confirm that this occurred from a review of documents, and conversations with Brost, Regier, Martin Werner and Capstick.

### THE OVERALL SCHEME AND ITS OPERATION

83.    The source of my personal knowledge, for this next section from ¶¶83-95 herein and below, derives from conversations I have had with Brost, Werner, Sorenson, investors, ASC investigators, Strategic Metal's Receiver, and Brost's Canadian accountants, as well as my review of American and Canadian tax filings, and my own personal observations.

26

84.    Brost and Sorenson solicited investors for a basket of investment opportunities in which the Merendon Mining enterprise was just one of these ventures. All told, while the promissory notes affiliated with Debtor only represented between $130,000,000 to $150,000,000, I have been told that Brost and Sorenson through their various investment vehicles raised between $1.2 billion and $5 billion, which is unaccounted for among 4,000 investors within the United States (1,000 participants) and Canada (approximately 3,000 participants).

85.    There were dozens of different types of entities in which the money raised for the Merendon Mining investment opportunity was used to support the other business opportunities of Sorenson and Brost. Those companies for which investor money was raised and went into are those identified on Debtor's Schedule B, Item # 13, and the schedule attached to the same. Of those funds, some went through US Bank, while others reached those other companies through different bank accounts and platforms around the world. There are additional properties that are in Canada, Central and South America.

86.    With regard to the Canadian properties, the property which was owned in Canada by Strategic Metals Corporation ("Strategic Metals") has been seized and sold by a Canadian receiver. Arbor (Arbour) Energy, Inc. ("Arbour") was purchased and then gutted with the cash going to Sorenson in the form of a $36 million loan. To my knowledge nothing has been paid on this loan or returned to the membership.  It is my understanding that amongst the assets associated with these investments was a magnetite mine in Canada that is still producing substantial magnetite ore. Much of the source of this information came from my review of Strategic Metals and Arbour documents and conversations with insiders of those entities.

27

87.    I have been informed by several sources, including Taylor, that both Brost and Sorenson were virtually penniless in the late 1990's when they got together and formed what would become the Merendon Mining entities. During the course of my association with the Brost/Sorenson group, I was told on several occasions by both Brost and Sorenson that they had started out in the late 1990's with a minimal capitalization and that everything that I was observing had been built up by the two of them over the years prior to our meeting. I would say that the bulk of their real growth began in 2002 and 2003 because that was when they were promoting, purchasing, and developing the Merendon Mining properties here in the United States.

88.    Brost's part in the venture was to run Capital Alternatives which was to be the member network and the sales force. Once the participants were found they became a part of Capital Alternatives, later IFFL, by investing in several different projects such as Strategic Metals, and other Canadian based investments.

89.    In 2001 and 2002, when I first met Brost, the American Merendon Mining entities were not yet part of the formula, neither were unnumbered accounts, such as SGD. The principle gold mining operation was in Honduras, and Sorenson was presented as a person of substance because he had developed gold mining property in Canada and was at this time deeply involved in the opportunities that he had discovered in Honduras and other South American countries.

90.    During 2001 and 2002 Brost's scheme was to set up a sales operation utilizing a structure consisting of structurists, strategists and bird dogs. The sales operations were headed up by Capstick. At its high point it appears that there were about 400 structurists, strategists and others within the sales chain. The list of structurists is

attached as an exhibit hereto. The sales chain took about 25% of all investor money for sales commissions and overhead with the other 75% either going into the various projects or otherwise being siphoned off by Brost, Sorenson and others for expenses. It was during this period that the participants were encouraged to set up their companies offshore, principally in Belize, and to list themselves as "Managers" for tax purposes.

91.    It was in 2002, that Brost first began the process of bringing Merendon Mining into the U.S. to develop mining properties in Colorado, Nevada, and California. At this time, participants were given the opportunity to invest their money into the development of these Merendon Mining properties with the guarantee of a substantial return as the development reached the production stage. Brost stated in at least one of the seminars that I attended that he was hoping to develop these entities for sale to larger mining operations. Thus, if he could prove up the mining property to the $1 to $5 billion level, then a larger company could step in to purchase the property and the investors could benefit more quickly with immediate cash from the sale. There was never any concern that the investors' royalties or monthly reimbursement on investment would be jeopardized or might end.

92.    Some of the initial participants with Brost in the early years of Merendon Mining were Kendall, Adair, Chris Houston ("Houston"), Joanne Assen ("Assen"), and Edna Michelle ("Michelle"). It was around the time of the start up of the American Merendon Mining companies that Capital Alternatives ceased to exist as a participant vehicle and IFFL came into existence as its replacement. All of the investors in the Merendon Mining gold mining operations, whether they were American or foreign, had to join IFFL.

93.    It was also at this time that a fund called the "SOD Fund" was developed and investors were given numbered bank accounts from which they could monitor their investment returns, if they chose that form of investment. Also at that time, the secondary investments, such as the collection upon credit delinquency were either dropped or were not presented as a part of the IFFL package, with all of the focus being on the Merendon Mining ventures.

94.    As of July, 2, 2003 Brost also created a Mining Interest Development Action Strategy ("MIDAS") program, and opened a MIDAS Fund office in Fort Lauderdale located at Corporate Office, Suite 300, 1451 W. Cypress Creek Road, Fort Lauderdale, FL. Brost and other structurists used that office to conduct sales seminars to potential investors within the U.S.

95.    On May 2, 2008, Debtor's Officers and Directors issued a memorandum to the investors indicating Debtor's default on its promissory notes to them, and advised its investors that Debtor, along with its subsidiaries in Colorado, Arizona and California, was changing its name to US-WEST Mining (Nevada) Corporation. (See attached notice of default). In its notice of default, Debtor offered its investors the option to convert their notes to an annuity paid by an insurance company created by SGD or to renew their notes, and then proceeded to describe the litany of then pending government administrative and criminal investigations and proceedings brought against Debtor, its affiliates, its principals, and management.

**PENDING ADMINISTRATIVE AND CRIMINAL INVESTIGATIONS**

96.     Both Brost and Sorenson have histories dating back to 1998 with the ASC

for a number of violations, including fraud, lying to investors and trading in securities

while not being registered with the commission.

97.     I am aware of these various investigations and proceedings described

below herein as a result of Atlantic and myself having been subpoenaed to produce

documents to these various investigative agencies, my review of the records to be

produced, and public documents associated with those investigations, and conversations

with some, but not all of the investigators, in the matters described below herein.

98.     ASC investigations into Merendon Mining Corporation Ltd. ("Merendon

Canada"), Strategic Metals, Arbour and the Institute for Financial Learning Group of

Companies Inc. (another name for IFFL) have been ongoing for years, with a number of

penalties and trading bans being issued over the past decade. Amongst the respondents to

the ASC actions were Brost, Sorenson, and Regier, as well as directors Edna Forrest and

Carol Weeks.

99.     Brost, Sorenson, Regier, and others have not only been sued by the ASC,

but are under criminal investigation by both Canadian and United States authorities.

100.    The Internal Revenue Service ("IRS"), in conjunction with the Department

of Justice ("DOJ"), had been conducting an investigation of Debtor in connection with

the MIDAS program. This investigation then expanded to include the program

surrounding Debtor's issuance of promissory notes to its investors, including IFFL and

SGD's role in the same, along with the management of each of those entities, and the

31

investigation apparently also includes a grand jury investigation brought by the DOJ in the Eastern District of New York.

101.    Two civil suits have also been brought in Houston and Seattle by the DOJ against accounting professionals to bar them from promoting the MIDAS program as an unlawful tax scheme involving bogus gold mining deductions involving Debtor and IFFL.

102.    The Colorado office of the Securities and Exchange Commission (the "SEC") also has a pending investigation against Debtor, its subsidiaries, affiliates and management, arising from violations of U.S. securities laws arising from Debtor's fundraising.

103.    On March 21, 2008, the State of Washington Department of Financial Institutions, Securities Division, has also brought actions against The Institute For Financial Learning Group of Companies, Inc.; Strategic Metals, Inc., Merendon Mining Corporation, Ltd., Milowe A. Brost; Ward K. Capstick; Kristina J. Katayama; Ronald R. Case; and Warren L. Bosma, who also comprise Debtor's officers and directors, and other accounting professionals, with respect to the sale of unregistered securities in that state.

104.    In March 2008 the Canadian Revenue Agency launched simultaneous raids on key IFFL figures.

105.    As part of a class action lawsuit brought by defrauded investors, on September 22, 2008, a Calgary Court appointed Michael Quilling as Receiver to recover the remaining assets from Strategic Metals. The money held by Strategic Metals has been seized by the receiver appointed over it in Canada. Strategic Metals and IFFL records

32

were kept in their offices in Calgary, yet were seized by Canadian regulatory authorities in 2005.

106.    On September 15, 2009, Brost was taken into custody and arrested by the Royal Canadian Mounted Police ("RCMP"), at which time an arrest warrant was also issued for Sorenson by the RCMP.

107.    This fact, and what is also conveyed herein regarding these investigations is public knowledge, and available in the public record.

## SORENSON'S PURPORTED DISASSOCIATING HIMSELF FROM BROST

108.    Following the commencement of all these investigations and proceedings, Brost started moved all other funding, including the monies in the US Bank accounts in Colorado, from one bank to another, where I last saw the monies had been transferred into Nordic Bank.

109.    By 2006 Werner stepped in and began seeking a stock offering or deal that would put aside the IFFL membership that had invested for a monthly royalty or return with the Merendon Mining program and also would allow funding from stock trading. It was at this time that Sorenson became concerned about the ownership of the Merendon Mining property by the IFFL membership, and by mid 2007 I was told that Sorenson was distancing himself from Brost.

110.    During this 2006 to 2007 period, Werner began working directly with Sorenson. It is during this time that various companies were formed by Werner which I believe were formed to bring the IFFL membership investment under Sorenson's control. As of today, Brost claims that Sorenson has all of the money and has left Brost and Brost's investors out to dry with no cash flow.

111.    With reference to the alleged split between Brost and Sorenson it apparently stems from complaints by Sorenson that Brost has used some of the collected funds for purposes other than those approved by Sorenson. Sorenson instructed Werner to write a letter to all investors in SGD (now Bahama Resource Alliance) notifying them that Sorenson was ostensibly trying to distance himself from the American Merendon Mining operations and claiming that he is not responsible for those investors. Sorenson has also claimed that the only operation that he had with Brost was the Merendon Canada and Merendon Central and South American Operations. This is also untrue in that Sorenson is listed as a Director in Cyprus for the 360 Earth Resources Foundation which he and Brost formed together in 2003 to shelter money from the entire Merendon Mining operation. For this purpose, Sorenson gave me a copy of his passport to be used in the forming of that corporation and also as a part of my due diligence background research on the Foundation membership.

**[Intentionally left blank]**

34

## HARM TO THE INVESTORS

112.    I have had direct communication with many of the investors in Atlantic's capacity as their income tax preparers. They are all in the same position; i.e., that Brost and his sales staff convinced them to mortgage all of their properties and give Brost and Sorenson all of the financing proceeds with promises from both of them that they would all be receiving a monthly cash flow that would be more than sufficient to allow them to meet their monthly incurred obligations. Now all of these investors are stuck having to pay the incurred indebtedness without receiving any of the promised cash flow. Some of the investors have already lost their homes and farms and one female investor has committed suicide in Canada. As the days and weeks go by there is more and more anguish from this large body of investors.

113.    Many of these investors are taking matters into their own hands, and have created "Investor Recovery Groups" whereby they solicit investors for money to be used to fund a private investigation into all these matters, and try to recover the assets stolen from them by the perpetrators of this fraud, and bring them to justice. However, many of these so called private investor groups are no more then fronts run by former structurists who are attempting to deflect their own potential civil or criminal liability from themselves, and are in fact interfering in attempts to recover monies on behalf of these investors.

114.    Lastly, these investors are further harmed because of substantial tax liabilities they are incurring notwithstanding that they documented their substantial losses from these schemes. Currently the Internal Revenue Service ("IRS") and various state tax regulators are still attempting to tax all of the participants for their participation in these investments even after their loss is evident. While the IRA rollovers have recognition by the IRS as legitimate; however, there

are still difficulties since the IRS will not allow a theft loss deduction without a final

determination of loss by this Court. Without conclusive evidence or a judicial determination that

a loss exists the IRS will not allow the investors a theft loss deduction.

FURTHER DECLARANT SAYETH NAUGHT.

_____
PAUL GARFINKLE

STATE OF FLORIDA          )
                          ) ss.:
COUNTY OF ~~PALM BEACH~~ BROWARD   )

THE FOREGOING instrument was acknowledged before me this _17th_ day of

September, 2009 by PAUL GARFINKLE, who is personally known to me or who has

produced _Fla. DL_ as identification and who did/did not take an oath.

_Patricia Tomlinson_
Notary Public, State of Florida
My Commission No: _DD 684009_
My Commission Expires: _8/26/2011_

NOTARY PUBLIC-STATE OF FLORIDA
Patricia Tomlinson
Commission #DD684009
Expires:  AUG. 26, 2011
BONDED THRU ATLANTIC BONDING CO., INC.

\351016\4 - # 504559 v1

36